IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2261

_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

        versus

LUZ ESTELLA SALAZAR,

                                        Defendant-Appellee.


* * * * *

_____

No. 91-2382

_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus

JOSE MANUEL RAMOS,

                                        Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

(April 10, 1992)


Before WILLIAMS and WIENER, Circuit Judges, and LITTLE,[1] District
Judge.

JERRE S. WILLIAMS, Circuit Judge:

     Jose Manuel Ramos and Luz Estella Salazar were convicted of

(count 1) conspiracy to possess over five kilograms of cocaine with

_____

     [1]  District Judge of the Western District of Louisiana,
sitting by designation.

intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, (count 2) aiding and abetting in the possession of over five kilograms of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2, and (count 3) aiding and abetting in an attempt to launder money obtained from unlawful activity in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2. Ramos contests the sufficiency of the evidence supporting his convictions. Finding no reversible error, we affirm the district court.[2] As to Salazar, the district court granted Salazar's post-verdict motion of acquittal. Upon a review of the record and applicable law, we reverse the district court and reinstate the jury verdict against Salazar on all three counts.

## I.  FACTS AND PRIOR PROCEEDINGS

This appeal involves the culmination of a series of surveillances occurring between May 1 and May 8, 1990, as part of a narcotics investigation. On May 1, 1990, United States Customs Service Special Agents and the Houston Police Department Narcotics Group received information that a warehouse at 5950 Bingle, Houston, Texas, was being used by Colombian money launderers to receive, distribute, and transport cocaine and narcotics-related

---

[2] At oral argument, Ramos' counsel appeared to suggest that Ramos had failed to move for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). The government did not allege such a failure in either its briefs or at oral argument. The record docket indicates that the district court denied a motion to acquit, although no formal motion to acquit is in the record.

proceeds. Investigation determined that Ramos was present at two meetings around April 27, 1990, at which the lease for the warehouse at 5950 Bingle was negotiated and executed.

Surveillance was established at the warehouse. Special Agent Brooks and Narcotics Officer Patton observed a white Chevrolet Astro van parked in front of the building under surveillance; a vehicle registration check revealed that the van was registered to a known narcotic trafficker, Fabio Urrego. A black Chrysler with Maryland license plates subsequently arrived at 5950 Bingle and its driver removed a package from the white van and placed it in the trunk of the Chrysler. Agent Brooks and Officer Patton then followed the Chrysler to a residence at 14020 Schroeder. The driver parked, went inside, and came out carrying a different package which he then placed in the Chrysler. He next drove to the area of Highway 290 and Bingle where he pulled into a parking lot. Soon thereafter, Ramos appeared, driving a silver Corsica. The driver of the Chrysler removed from its trunk the package he had taken from the Schroeder address and got into the Corsica with Ramos. Ramos was then observed making heat runs--erratic driving maneuvers to detect if being followed--for about forty-five minutes.

Eventually, Ramos drove the Corsica back to the parking lot, and the driver of the Chrysler returned to his vehicle carrying a package smaller than the one taken from the Schroeder address. Both the Chrysler and the Corsica were next observed driving into a fenced area of the warehouse at 5950 Bingle. Subsequently, the

3

surveillance unit observed Ramos continually looking out of the open bay door of the warehouse.

The Chrysler and the white van were then seen traveling in tandem, making heat runs, and ultimately entering the Nantucket Square Apartments. Agent Brooks later saw Ramos drive the Corsica into the rear of the Nantucket Square Apartments, exit the apartment complex, and park at a side street nearby. Agent Brooks and Officer Patton witnessed further furtive, erratic moves by the white van and the Chrysler before the automobiles returned to the apartment complex and parked inside a garage.

Surveillance next saw the white van pull into a parking lot next to Slick Willie's, a pool hall in the FM 1960 area. Late that evening, Officer Patton, while following the white van, observed Ramos driving a dark Buick. Officer Patton saw Ramos turn towards the vicinity of Slick Willie's. Soon thereafter, the white van was detained by the Baytown Police Department, 416 kilograms of cocaine were found inside, and the driver, Lazaro Fontecha, was placed in custody.[3]

Searches were then conducted in the warehouse at 5950 Bingle, in an apartment and its surrounding building at the Nantucket

_____

[3] Fontecha entered into a plea agreement with the government. Some facts concerning this alleged co-conspirator, however, remain relevant. Fontecha was an independent truck driver living in Florida who was in the business of hauling loads on consignment. He had previously transported loads of cocaine and had arranged for transportation of this load of cocaine by calling a local beeper number after he arrived in Houston around April 30th--a beeper linked either to Ramos or Salazar, or one of the unnamed co-conspirators. The record indicates that Fontecha met his Houston contact at Slick Willie's the same evening Ramos was observed there.

4

Square Apartments, and in an apartment at 14020 Schroeder. At the Bingle warehouse, items seized included a fuel tanker truck complete with false compartments, some containing cocaine, that had a North Carolina license plate on its rear, and a tractor rig having a Guatemalan license plate. Also seized were a generator, a Black & Decker saw with special carbide blades, a crowbar, metal boxes capable of being used as hidden compartments in vehicles, and other miscellaneous tools. Agents later found that the markings on some of the kilogram packages of cocaine found in the tanker were the same markings found on some of the kilogram packages seized from the white van.

At 14020 Schroeder, agents found a pickup truck in the garage with $900,000 in cash in a tool box in the truck's bed. The money was bundled in thousands and ten thousands and bound with colored and beige rubber bands. Similarly, inside the residence, two boxes of beige rubber bands and numerous colored rubber bands were found along with a torn piece of United States currency, and a series of photographs of Ramos at a shooting range.

The Nantucket Square apartment had no furnishings and the Chrysler was parked in the apartment's garage. The Chrysler's trunk had a 2-by-1 1/2 foot hidden compartment capable of holding several kilos of cocaine as well as currency.

Agents subsequently learned through confidential sources that Ramos and Salazar leased an apartment at the Timber Top Apartments. The evidence at trial showed that Apartment #905 was leased to David and Maria Rodriguez, aliases for Ramos and Salazar. Agents

5

obtained a search warrant for the premises and set up surveillance units.  On May 8th, Officer Patton observed Salazar arriving at the apartment driving the same Buick that Ramos had been driving in the early morning hours of May 2, 1990, during the delivery of the 416 kilograms of cocaine to Fontecha.  Salazar entered the apartment using a key.  About 20 to 25 minutes later, she left carrying a black and white plastic shopping bag.  After making heat runs, Salazar drove to an office complex in southwest Houston.  There she entered Emily Investments carrying a large, bulky manila envelope, which she left there.  She then drove to a strip center area of the Gulf Freeway and entered a business called Gonzales Insurance. Gonzales Insurance offered money wire transfers to Mexico and to all countries in Central and South America, as well as insurance, beeper, and cellular telephone sales, bail bonds, rental mailboxes.

A year earlier, Salazar had purchased a non-owner automobile liability insurance policy from Gonzales Insurance.  In addition, Ramos and Salazar had purchased a beeper there about eight to ten days earlier.  Salazar entered the business carrying her purse.[4] Minutes later, she came back to the car and got the black and white plastic shopping bag.  When Salazar re-entered the business she saw the agents approach her.  She walked to the rear of the business with the bag.  She was detained, and the bag, containing $77,000 in

---

[4]  At trial, David Gonzales, the owner of Gonzales Insurance, who arrived at the business after Salazar was arrested, testified that Salazar wanted to return the beeper because it was not working properly.

6

bundles of U. S. currency, was found at the rear of the store on top of a door ledge.

In the search of the Buick, agents found a California driver's license in the name of Jose Manuel Ramos, mobile phones, a six-page "drug ledger," photographs of Salazar, and a residential lease agreement in the names of David and Maria Rodriguez for the Timber Top apartment. The lease indicated that the Rodriguezes moved into the apartment on April 16, 1990, and a security guard testified that he had seen Salazar and Ramos move in with a small child.

Salazar's purse was found to contain a Colombian passport in the name of Luz Estella Salazar Munoz; a set of keys to the black Chrysler and to its false compartment; a key ring marked "'88 Astro white" containing four serialized plastic key punch-outs (the key later made from the punch-outs fit the white van from which the cocaine was recovered); two sets of keys for the Timber Top apartment; two address books; and a photograph of a small child.

Subsequently, a search of the Timber Top apartment was conducted. Cash totaling $1,200,000 was seized. The money was found in bundles inside a washing machine, a safe, and a dresser drawer. The agents also seized a residential lease agreement identical to the one recovered from the Buick; an insurance policy in the name of Luz Salazar; a boat registration receipt made out to Estella Salazar; a doctor's receipt in the name of Jose M. Ramos; and male and female clothing in the master bedroom.

Drug ledgers also found inside the apartment were seized. These drug ledgers, together with the ones found in the Buick, were

analyzed for fingerprints. Three of Ramos' fingerprints were identified on the drug ledger sheets that were taken from the Buick; one of Salazar's fingerprints was also found on one of the sheets. Ramos' fingerprints were also identified on the drug ledgers that were recovered from the Timber Top apartment. According to an expert in illicit business records analysis, the drug ledgers reflected, among others, a transaction involving at least 301 kilograms of cocaine sold for over $5 million and included a list of expenses generally associated with the activities of an illicit drug business--costs for beepers and telephones. Correlations were also found between the account headings in the drug ledgers and some of the entries in the address books recovered from Salazar's purse at the time of her arrest.[5]

During the course of further investigation, another search warrant was executed at 100 Plantation in Houston. A passport seized there contained photographs of Ramos and Salazar under the aliases of David Navia Rodriguez and Rosa Maria Mia de Rodriguez. Upon Ramos' arrest, around August 1, 1990, another search warrant was executed at 3228 Canterbury and more documents and passports were seized. Those documents included a paper removed from Ramos' suitcase which contained the name Fabio Urrego, the same name on the title to the white van used to transport the cocaine. There were also Mexican passports bearing Ramos' photograph and the name

---

[5] For instance, on the Buick ledger, about 170 kilograms was reflected as sold to "Perla," "Negro," and "Polo," among others. The address books contained telephone numbers and references to those and other names.

Alejandro Salinas Sanchez as well as a visa permit for the Republica de Colombia.

## II.  DISCUSSION

### A.  JOSE MANUEL RAMOS

#### 1.  Standard of Review

Ramos asserts that there was insufficient evidence to support his convictions.  We review his claim under the well established standard that the Court view the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict.  U.S. v. Pigrum, 922 F.2d 249, 253 (5th Cir.), cert. denied, __ U.S. __, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991); United States v. Molinar-Apodaca, 889 F.2d 1417, 1423 (5th Cir. 1989).  The ultimate test for sufficiency of the evidence challenges is whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt.  See United States v. Gonzales, 866 F.2d 781, 783 (5th Cir.), cert. denied, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d. 994 (1989).

#### 2. Count 1

Count 1 involves Ramos' conviction for conspiracy.[6]  In a conspiracy prosecution under 21 U.S.C. § 846, the government is required to prove:  (1) that an agreement exists between two or more persons to violate the narcotics laws, (2) that each conspirator knew of the conspiracy and intended to join it, and (3) that each conspirator did voluntarily participate in the conspiracy.  United States v. Juarez-Fierro, 935 F.2d 672, 677 (5th Cir.), cert. denied, __ U.S. __, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991).  All elements may be inferred from circumstantial evidence. Id.  Moreover, "`[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof.'"  United States v. Roberts, 913 F.2d 211, 218 (5th Cir. 1990) (citation omitted), cert. denied, __ U.S. __, 111 S.Ct. 2264, 114 L.Ed.2d 716 (1991).

Ramos argues that knowledge and acquiescence in the conspiracy are not to be lightly inferred.  Ramos was never seen in possession of any cocaine and was never seen coming from or going into the

---

[6]  At oral argument, Ramos appeared to argue for the first time on appeal that the evidence does not conform to a charge for this particular conspiracy, implying the potential for various conspiracies at work.  Our review of the record and the briefs indicates that Ramos did not address prior to oral argument the notion of the government's failure to prove a single conspiracy. "[I]ssues raised for the first time on appeal `are not reviewable by this Court unless they involve purely legal questions and failure to consider them would result in manifest injustice.'" United States v. Sherbak, 950 F.2d 1095 (5th Cir. 1992) (per curiam) (citation omitted).  Hence we find that review is not proper.  A determination of the presence of a single conspiracy constitutes a fact question and failure to consider the issue does not result in manifest injustice.

Schroeder or Nantucket Square apartments.  His fingerprints were not found in any of the packages or boxes containing cocaine or in the white van.  Furthermore, the fact that his fingerprints were found on the drug ledgers is insufficient to support his conviction.  No evidence exists that Ramos ever wrote or read the information contained in those papers.[7]

The elements of a conspiracy "may be inferred from the `development and collocation of circumstances.'" United States v. Gallo, 927 F.2d 815, 820 (5th Cir. 1991) (citation omitted). Although Ramos was never seen in the possession of cocaine or in the vicinity of the Schroeder or Nantucket Square apartments,  we find that the evidence establishes a concert of action among Ramos, Salazar, Fontecha, and other unnamed conspirators.  Ramos and Salazar used aliases to move into the Timber Top apartment, a residence later found to contain a money counting machine, a bullet

_____

[7] Salazar and Ramos address the fingerprint issue throughout their briefs and attempt to denigrate its significance by citing primarily to United States v. Lonsdale, 577 F.2d 923 (5th Cir. 1978) and United States v. Stephenson, 474 F.2d 1353 (5th Cir. 1973).  First, these cases do not stand for the proposition that fingerprint evidence is irrelevant.  Such cases address the issue of whether fingerprint evidence standing alone suffices to sustain a conviction where no evidence exists concerning when the fingerprint was implanted or other significant evidence connecting the accused to the crime.  Consequently, they are clearly distinguishable from this case.  We find that the fingerprint evidence is relevant and admissible as circumstantial evidence of Ramos' and Salazar's involvement, and together with other evidence, support their convictions. Second, as this Court recently noted in Gibson v. Collins, 947 F.2d 780, 782 (5th Cir. 1991), Lonsdale and Stephenson treated circumstantial evidence as insufficient to support a conviction unless that evidence excluded every reasonable hypothesis of the defendant's innocence.  This standard has been rejected by this Circuit in United States v. Bell, 678 F.2d 547 (5th Cir. 1982), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983), and its progeny.

11

proof vest, and approximately $1.2 million.  Additionally, a drug ledger recovered from the vehicle Salazar was driving on May 8, 1990, a vehicle Ramos was seen driving earlier, bore both Ramos' and Salazar's fingerprints, and revealed that 170 kilograms of cocaine had been purchased at a price of $17,300 per kilogram and resold at a price of $18,500 per kilogram.  Ramos was also present when the lease at the warehouse at 5950 Bingle was negotiated and later signed.  Moreover, Ramos went with Salazar to Gonzales Insurance and purchased a beeper that later by inference was used to make contact with Fontecha.  Seven hours before Fontecha took possession of the white van containing the 416 kilograms of cocaine, Ramos was actively involved with unnamed persons in exchanging packages with others and placing them in false compartments of cars, and was present when the white van entered the Bingle warehouse.  Based upon these facts, the jury could reasonably determine that Ramos was actively involved in the conspiracy.

### 3.  Count 2

The challenges to the sufficiency of the evidence to support Ramos' conviction for aiding and abetting in the possession of a controlled substance with intent to distribute also must fail. "The crime of aiding and abetting occurs when the defendant associates with a criminal venture, purposefully participates in it, and seeks by his actions to make it succeed." United States v. Vaden, 912 F.2d 780, 783 (5th Cir. 1990).  A conviction for aiding

12

and abetting the possession of a controlled substance with intent to distribute does not require that Ramos have actual or constructive possession of the drugs. United States v. Pena, 949 F.2d 751, 755 (5th Cir. 1991). It merely requires that Ramos' association and participation with the venture were in a way calculated to bring about that venture's success.

Ramos focuses primarily on the issue of possession. Ramos first contends that the mere fact that he may have been the person who rented the warehouse on Bingle is insufficient to infer knowing dominion and control over any items present at the warehouse. Second, the government has not shown that Ramos has exercised any dominion and control over the white van and its contents. As earlier stated, however, Ramos' conviction merely requires association and participation in the venture, not his actual or constructive possession of the drug. Nonetheless, even assuming possession were required, when the evidence is sufficient to establish the defendant's participation in a conspiracy to possess illegal narcotics, the defendant will be deemed to possess narcotics through his co-conspirator's possession. United States v. Medina, 887 F.2d 528, 532 (5th Cir. 1989).

Since there is direct evidence that his alleged co-conspirator Fontecha possessed the cocaine in the white van, Ramos could properly be deemed to have possessed the cocaine through Fontecha's possession. We have recognized that "[t]ypically, the same evidence will support both a conspiracy and an aiding and abetting conviction." United States v. Singh, 922 F.2d 1169, 1173 (5th

13

Cir.), <u>cert. denied</u>, __ U.S. __, 111 S.Ct. 2066, 114 L.Ed.2d 471, <u>cert. denied</u>, __ U.S. __, 112 S.Ct. 260, 116 L.Ed.2d 214 (1991). Thus, the same evidence that proved Ramos' participation in the conspiracy to possess cocaine with intent to distribute is sufficient to support his conviction for aiding and abetting in the possession of cocaine with intent to distribute.

### 4. Count 3

Finally, Ramos questions the sufficiency of the evidence to support his conviction for aiding and abetting an attempt to commit money laundering. His pivotal contention is that because the district judge granted Salazar's motion for judgment of acquittal on the money laundering count, he cannot be vicariously liable for her conduct. Because we hold that the district court's decision as to direct Salazar's acquittal must be reversed, this contention loses vitality.

We have stated a two-step test for finding criminal attempt. "To be guilty of an attempt, the defendant (1) `must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting,' and (2) `must have engaged in conduct which constitutes a substantial step toward commission of the crime.'" <u>United States v. Briscoe</u>, 742 F.2d 842, 846 (5th Cir. 1984) (citation omitted). In order to establish a violation of 18 U.S.C. § 1956, the government must prove that the defendant (1) knowingly conducted a financial

14

transaction,[8] (2) which involved the proceeds of unlawful activity, and (3) with the intent to promote or further that unlawful activity.

Ramos argues that his conviction cannot stand because insufficient evidence was presented connecting him to Salazar's presence at Gonzales Insurance on May 8th when she took the $77,000[9] into the business. In order for Ramos to be guilty of aiding and abetting in the attempted money laundering, the government must prove that Ramos shared Salazar's intent and that he engaged in conduct designed to aid the attempt. According to the government, Ramos' intent to transfer the proceeds from cocaine trafficking out of the country can be reasonably inferred from the evidence showing his involvement as a cocaine broker. Furthermore, he used a false name to lease the Timber Top apartment where large portions of the drug proceeds, including the $77,000, were kept. Further, the apartment contained the money counting machine. Finally, he used the drug ledgers to record his transactions. From all these facts, the government urges that the jury could

---

[8] "Financial transaction," in this context, means "the movement of funds by wire or other means . . . which in any way or degree affects interstate or foreign commerce." 18 U.S.C. § 1956(c)(4).

[9] According to the government, if the $77,000 that Salazar carried into the business were divided into eight convenient $9,000 transfers (to evade currency reporting requirements under the Currency Transaction Reportings Act, 31 U.S.C. § 5311, et seq.) and if a seven percent charge of $5,040 were added to that amount (what Gonzales Insurance would have charged for sending eight $9,000 transfers totalling $72,000 to Colombia), the total cost for the transfers would be $77,040, an amount remarkably close to $77,000.

15

reasonably infer conduct designed to aid Salazar's attempt to transfer drug money.

Our review of the record indicates that ample evidence exists to provide the requisite nexus between Salazar and Ramos to affirm the conviction of aiding and abetting in an attempt to money launder.

B. LUZ ESTELLA SALAZAR

1. Standard of Review

The crux of the government's argument as to Salazar is that the district court utilized the wrong standard in granting Salazar's motion for judgment of acquittal. According to the government, the district court's comments in ruling on the motion indicate that it held the government to a higher burden of proof than the law requires.

> THE COURT: . . . I suppose, where the question has to be put to me, as a question of law, what is it you have to exclude in order for the evidence to be sufficient for circumstantial evidence to constitute what a jury should consider?
>
> It seems to me, and maybe I am in error in this, that under a circumstantial evidence case where all the evidence is circumstantial, when I say "all" I mean the conclusions to be reached have to be reached based upon some other points that don't necessarily link themselves together but which are separate individual pieces of evidence.
>
> It seems to me you have to exclude some of those reasonable other alternatives that the jury could reach by direct evidence, by some evidence. When I say "direct evidence," I mean some actual evidence that is not a reasonable alternative.

16

In other words, I don't think that a jury can reach a verdict on a circumstantial evidence case by simply saying that, okay, this is one way it could have gone. It could have gone another way; it could have gone a third way or fourth way, but the way I think it really went is this way, and the reason I think that is because that's the way I feel. They have to have some evidence that guides and leads them in that direction more than simply a scintilla of evidence.

And what I'm suggesting is that the underlying basis, the underlying premises for the circumstantial evidence case is inadequate, in my opinion, in order for a jury to reach and come to that kind of conclusion. That's the problem I have.

The government urges that in United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd, 462 U.S. 356, 103 S.Ct. 2398, 76 L.E.2d 638 (1983), this Court specifically rejected the standard set out by the district court for judging the sufficiency of the evidence in a circumstantial evidence case. The test is not whether the evidence excludes every reasonable hypothesis of innocence or is wholly inconsistent with every conclusion except that of guilt, but whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. "Further, this [C]ourt accepts all credibility choices that tend to support the jury's verdict." Gallo, 927 F.2d at 820.

Salazar concedes that the government need not disprove all other reasonable hypotheses to sustain a conviction. But she asserts that the "outstanding reasonable hypothesis rule" (a term she leaves undefined) has vitality as an analytical tool even if it is not the test to determine the legal sufficiency of the evidence. She relies upon United States v. Espinoza-Seanez, 862 F.2d 526, 538

17

(5th Cir. 1988). In Espinoza-Seanez, the entire government case against one of the defendants consisted of only four facts which this Court found insufficient to prove knowledge of the conspiracy. We found that though we do give the jury deference in questions of credibility of testimony, the case was not one where "competing explanations" were being offered. We observed that "`[t]oo many innocent scenarios jibe with the sparse record facts.'"

Salazar's attempt to utilize Espinoza-Seanez to differentiate a rule from a test is inventive, but unavailing. The cases are broadly distinguishable. In this case, a number of factors, taken together, support her conviction on the various counts. "As the United States Supreme Court remarked long ago, `[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.'" United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989) (quoting Coggeshall v. United States (The Slavers, Reindeer), 69 U.S. (2 Wall.) 383, 17 L.Ed. 911, 914-15 (1865)).

Salazar also asserts that while the district court's statements concerning the sufficiency of the evidence "may incorrectly state the legal test, it applied the correct legal test." But we can only consider the record. After a close scrutiny of the record, we find that the district court did apply a more stringent burden of proof than is required by the law. Using the proper standard of review, we address and evaluate the

18

district court's determinations leading to its judgment of acquittal.

## 2.  Count One

As to count one, the district court found that there was an insufficient link between Salazar and the 416 kilograms of cocaine seized from the white van.  Although the court conceded that the cocaine seized from the van could have been a part of a larger shipment, it was not satisfied that it was sufficiently linked to the ledger on which Salazar's fingerprints had been found.  Second, although it noted that Salazar's possession of the punch-outs for the keys to the van was some evidence linking her to the cocaine, the court concluded that, standing alone, it was insufficient. While the court did observe that the government proved that Salazar was involved in some criminal activity, it concluded that the government failed to prove that Salazar was involved in the conspiracy.

Salazar argues the insufficiency of the evidence by focusing upon the factors considered critical by the government:  (1) she shared an apartment with Ramos; (2) she was driving Ramos' car and had keys to the other cars; (3) her fingerprints were on sheets of what the government proved as a drug ledger; (4) she possessed a Colombian passport; and (5) she took $77,000 to Gonzalez Insurance.

Salazar acknowledges that based upon Ramos' involvement in the cocaine conspiracy, a reasonable jury could infer that due to her close relationship with him, Salazar knew of the existence of the conspiracy.  This alone, she urges, does not constitute sufficient evidence to support a conspiracy conviction.  Salazar relies primarily on United States v. Onick, 889 F.2d 1425, 1429

(5th Cir. 1989). We find that case inapposite. There, only four unpersuasive items of evidence connected Onick to the case: (1) she was found on the premises in her nightgown when the house was searched; (2) a bedroom closet contained women's clothing; (3) the bedroom contained a photograph of Onick with Tolliver, the man convicted with her, and an unidentified man; and (4) several months before her arrest, Onick had showed a locksmith where to install a safe on the premises. We held that we would not lightly impute dominion or control to establish constructive possession to one found in another's house. Moreover, the jury must limit itself to reasonable constructions of the evidence, not mere speculations.

This case does not present a question of whether four undisputed casual circumstantial facts are sufficient to convict Salazar of conspiracy beyond a reasonable doubt. In contrast to Onick's situation, Salazar lived with Ramos in the apartment; she had moved in with him (under an alias) and had complete access to the residence; she also had possession of the keys, or their equivalent, to three vehicles used in the drug transactions. Moreover, while in the company of Ramos, some time between April 28th and 30th, she purchased a beeper; Fontecha, the driver of the white van, made contact with either Ramos or Salazar, or one of the unnamed co-conspirators, by beeper around April 30th. Also evidence indicates Salazar's involvement in the conspiracy because she had access to the million dollars in the apartment and the fact that she took the $77,000 to Gonzales Insurance. Evidence that an individual is "solely entrusted with a large portion of the

21

proceeds of the drug trafficking enterprise establishes [her] familiarity with, or high level participation in, that enterprise." Gallo, 927 F.2d at 821. Additionally, one cannot escape criminal liability on the basis that one played a relatively minor role in the total scheme. United States v. Davis, 666 F.2d 195, 201 (5th Cir. 1982). Finally, Salazar's knowledge of the contents of the drug ledgers could reasonably be inferred from the presence of her fingerprints on one of the ledgers, from her possession of address books bearing some of the same names that were used as account designations in the ledgers, and from the presence of other ledgers in her residence containing information that corresponded to the information contained in the ledgers found in the Buick. Viewed cumulatively, this evidence was sufficient to uphold a jury verdict of Salazar's participation in the conspiracy.

### 3. Count 2

In granting the motion for judgment of acquittal on count two, the district court found that there was no evidence presented showing that Salazar aided and abetted the particular transaction involving the shipment of 416 kilograms of cocaine. We disagree. Because the evidence is sufficient to support Salazar's conspiracy conviction, and she is deemed to have possessed cocaine through her co-conspirator's possession, the evidence is sufficient also to support her conviction for aiding and abetting the possession of cocaine with intent to distribute. As we stated in the discussion of Ramos' conviction, the same evidence often supports both a

22

conspiracy and an aiding and abetting conviction.  <u>Singh</u>, 922 F.2d at 1173.


### 4.  Count 3

In granting the motion for judgment of acquittal on count three, aiding and abetting in an attempt to launder the money, the district court concluded that Salazar had not taken enough steps toward completion of a financial transaction to support a finding of criminal attempt.  Section 18 U.S.C. § 1956(a)(1) prohibits knowing involvement in a financial transaction that uses the proceeds of some form of unlawful activity.  In order to prove an attempt, the government must satisfy this Circuit's two requirements of proof that there was (1) an action involving the kind of culpability otherwise required for the commission of the crime upon which the charge of the attempt is based and (2) conduct constituting a substantial step toward commission of the crime.  <u>United States v. Contreras</u>, 950 F.2d 232, 237 (5th Cir. 1991).

Salazar concedes that a rational jury could find that she knew that the money in the apartment was the proceeds of illegal activity due to the large amount of cash.  She also agrees that the evidence supports a jury finding that the money was in fact from drug-trafficking.  Salazar asserts, however, that the government has failed to prove the remaining element:  that she knowingly undertook to conduct a financial transaction with the intent to promote or further that unlawful activity.  According to Salazar, the government is relying on inferences stacked upon inferences in

23

order to justify a guilty verdict. Further, in applying the law of attempt, Salazar asserts that there are insufficient objective acts performed which are unique rather than commonplace to mark her conduct as criminal in nature as a violation of 18 U.S.C. § 1956. In essence, she asserts that questions exist whether she took a substantial step which is strongly corroborative of the firmness of criminal intent.

Our review of the record finds sufficient evidence demonstrating both Salazar's intent to carry out the money laundering and her commission of a substantial step toward that end. Proof of Salazar's intent to transfer drug proceeds out of the country in order to promote the drug activity is corroborated not only by her physical acts of removing the money from the Timber Top apartment and bringing it to a place where the transaction was to occur, but also by her involvement in the drug conspiracy. Taken in the aggregate and viewed in the light most favorable to the government, a reasonable jury could conclude sufficient evidence exists to convict her. Salazar had a Colombian passport in her possession when she arrived at Gonzales Insurance, a business which offered wire transfers to Colombia. Upon arrival, she first entered the business empty handed and then returned for the money. Upon re-entering the business and seeing agents approach her, Salazar walked to the rear of the business with the bag and placed it on top of a door ledge. Although it perhaps is possible that Salazar planned to do something else with the money, the amount involved and the services offered at the business make

24

such an alternative overwhelmingly unlikely. No indication exists on the record that any other possible expenditure in that business could cost $77,000.

Salazar's objective acts are not consistent with innocent activity. Her actions, when taken as a whole, show that she moved beyond preparation. There is adequate evidence to establish the required culpability. We find that the jury was justified under the evidence in finding Salazar guilty of aiding and abetting an attempt to launder drug proceeds.

## III. CONCLUSION

We conclude that sufficient evidence sustains Ramos' convictions. We also find that the district court erred in granting Salazar's motion for judgment of acquittal as to her conviction. The jury chose not to believe Salazar. Instead, it found her acts to be sufficiently unique and strongly corroborative of her criminal intent as to all counts. We hold the evidence sufficient to reverse the court's granting of the motions for acquittal and reinstate the jury's convictions against Salazar. We remand for the sentencing of Salazar.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR SENTENCING.