UNITED STATES of America,
Plaintiff–Appellee,

v.

Julius C. BOMAR, Defendant–Appellant.

No. 92–2534.

United States Court of Appeals,
Fifth Circuit.

Nov. 16, 1993.

Ronnie G. Harrison, Houston, TX (Court-appointed), for defendant-appellant.

Paula Offenhauser, Asst. U.S. Atty., Ronald G. Woods, U.S. Atty., Houston, TX, for plaintiff-appellee.

Before GARWOOD, DAVIS and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Julius C. Bomar (Bomar) challenges the sufficiency of the evidence supporting his conviction for violation of a provision of the Soldiers' and Sailors' Civil Relief Act of 1940 (the Act), 50 U.S.C.app. § 535(2), (3). Bomar was convicted of enforcing and attempting to enforce, without seeking court approval, a lien for storage of a 1985 Chevrolet Camaro owned by Gordon McNeely (McNeely), a corporal in the United States Army Reserve Unit who served on active duty in Saudi Arabia during Operation Desert Storm. He challenges the sufficiency of the evidence supporting his conviction. We affirm.

---

1. While stationed in Saudi Arabia during Operation Desert Storm, McNeely was transferred to the 327th Chemical Company, a sister unit.

2. McNeely testified that he chose Buy Direct on the strength of an advertisement in a local Green Sheet; Buy Direct was the only business which promised same-day service.

3. Before the district court, Bomar attempted to show that references to "Doc" need not implicate him. The defense called Arturo Perez, an employee of Buy Direct during the relevant time period. Perez testified that during February, March, and April 1991, a part-time manager

## Factual Background

McNeely was a corporal in the United States Army Reserves, serving with the 340th Chemical Company, a chemical decontamination unit trained to combat the effects of chemical warfare.[1] On November 17, 1990, he received his orders placing him on active military duty, and his unit was assigned to Fort Hood, Texas, to prepare for Operation Desert Storm.

Central to this prosecution is a 1985 Chevrolet Camaro which McNeely bought from his sister, Meredith McNeely Phipher (Meredith), in July 1988. On December 15, 1990, while on leave from Fort Hood, McNeely went to Houston, Texas. He was experiencing problems with his car, which he attributed to the transmission. He took the car to a local transmission shop, Buy Direct Transmission (Buy Direct).[2] There, the defendant, who identified himself as "Doc,"[3] said he was too busy to look at McNeely's car at that time. McNeely informed Bomar that he was stationed at Fort Hood and would not be able to bring the car back the following day. Bomar suggested that McNeely leave the car there for him to inspect at his (Bomar's) first opportunity. McNeely agreed, and instructed Bomar to look at the transmission but to notify him before any work was done on the car; McNeely left Bomar the telephone number to his unit at Fort Hood in order for the defendant to reach him with the information about his car.

Several days later, on the 17th, McNeely called Buy Direct from Fort Hood and asked to speak to Doc. The defendant came to the phone. McNeely told Bomar not to do any work on the car and that he would send someone to pick it up. Bomar replied that

named Leo worked for Buy Direct; this employee occasionally identified himself over the telephone as "Doc." Perez conceded on cross-examination by the government, however, that if he thought of "Doc" at Buy Direct, he thought of Bomar, not Leo; he also stated that he had never heard Leo discuss McNeely's car with anyone, but that he did know of at least one occasion when Bomar spoke with someone about the car.

We hold that the evidence is sufficient to conclude that the person identified as "Doc" is the defendant, Julius Bomar.

he had already disassembled the car's transmission and requested payment in the amount of $194 for his labor. McNeely asked him to put the car back together for someone to pick up; Bomar then stated that if he had to reassemble the vehicle, he would have to charge approximately $400. Bomar demanded full payment in order to release the car and hung up the phone.

During the next week, McNeely tried unsuccessfully to call Buy Direct. During his leave for the Christmas holidays, he went to Buy Direct to get his car, but the business was closed. Finally, on January 7, 1991, while again on leave from Fort Hood, McNeely went to Buy Direct and spoke to Bomar about working out a deal with him on the car. Because he did not want to pay $400 for nothing and because his departure for Saudi Arabia was imminent, McNeely agreed to buy another transmission and pay Bomar $70 to install it. McNeely left, and later returned to Buy Direct with a transmission he had purchased for the car. Bomar told him it would take about an hour to install the new transmission, and McNeely left the shop.

McNeely was gone for approximately three hours. During that time, he called Buy Direct twice to determine if his car was ready; both times Bomar informed him that it was not ready. McNeely told Bomar that he was due back at Fort Hood that evening and needed his car to get there; Bomar assured him that it was almost ready. McNeely finished up some personal business and went to Buy Direct where he found that his car still was not repaired. When the car was finally ready, Bomar told him that he had done some additional work on the car and that the charges would be $194. McNeely reminded him of the agreed $70 for the installation, but Bomar demanded $194 to release the car. McNeely did not have the full amount in cash, but he offered to pay $100 in cash, write a check for $94, and let Bomar keep the old transmission. Bomar insisted on the entire $194 in cash.[4] McNeely told him he could get the remaining money in cash in about fifteen minutes, from his mother who worked six blocks from the Buy Direct business. Bomar then told him that he did not want to wait for the money.

At this point, McNeely asked Bomar to call the owner of Buy Direct; when Bomar refused, McNeely asked him to call the Houston Police Department. When Bomar declined to do so, McNeely again asked him to call the owner. Bomar again refused and pulled a pistol from a desk drawer, cocked it, and said "This is the only person I need to talk to." McNeely left the store.

McNeely drove in his mother's car to a nearby convenience store where he attempted to flag down a police car; failing that, he went to a police substation and filled out the initial report for an aggravated assault charge. Later, he returned to the convenience store where he called 911. Two officers responded to the call, and after McNeely explained the situation to them, they proceeded to Buy Direct. The shop was closed, and no one was there.

McNeely picked his mother up and rented a car to get back to Fort Hood. Within the week, his army unit was sent to Saudi Arabia. Once in Saudi Arabia, McNeely's unit was sent to the front, and it was not until March 1991 that he was able to attempt communication with Buy Direct.

On March 15, he called Buy Direct, asked to speak with Doc, and told Doc, or Bomar, that he was returning soon to the United States and wanted to pick up the car. Bomar told him it would cost approximately $2,000 to redeem the car and informed him that the money was for storage fees. While he was in Saudi Arabia, McNeely contacted his mother and sister and requested them to try to get the car from Buy Direct.

McNeely returned to the United States on April 21, 1991. His sister informed him that there was a lien on the car. McNeely consulted an attorney, who advised him to make no attempt to get his car back.

Meredith testified that she was not aware of any problems with her brother's car until

---

4. Buy Direct had a store policy of not accepting checks. There were signs to this effect around the business premises.

after he had left for Saudi Arabia. He called her collect from Saudi Arabia to ask her to ask their mother to get the car from Buy Direct. McNeely's mother (Mrs. McNeely) telephoned Buy Direct and ascertained that the car was still there. She spoke with Bomar, who identified himself as "Doc." Mrs. McNeely explained that she was McNeely's mother and would like to pick up the car; Bomar told her he wanted $1800 for the car. In response to questioning by Mrs. McNeely, he explained that $195 was for repairs and the rest for storage. Meredith also spoke to Bomar over the telephone; he told her he did not want to talk to her about the car because it was not her car and she had not brought it in to him.

Later, Meredith again spoke with Bomar over the telephone. He told her it would cost $1,800 or $1,900 to get the car back; according to the defendant, $194.50 was for actual work done, and the rest of the fee was for storage fees, at $15 per day. Bomar told her he had sent her some papers, which she had not received due to a recent move. She gave him her new address.

After Meredith received a paper from U.S. Data Link, a titling company used by Bomar to process lien requests, she called Bomar. The paper stated the defendant would have a lien on the car if she did not pay $194.50. When she subsequently talked to Bomar, he told her that the $194.50 was for the car repairs, but that storage fees totalled over $2,000 at that time. He informed her that if she did not retrieve the car within thirty days by paying the full bill, he would sell the car at auction. According to Meredith, Bomar told her if she paid, she could have the car; he did not quibble over her not being the owner of the car.

Mrs. McNeely went to Buy Direct on March 25, 1991. Bomar was not in the office. She waited for two hours until the defendant arrived. He introduced himself as "Doc." They went into his office and talked about the price of the car. He told her the charges for the car were $2,000, $195 for repairs and the remainder for storage. Mrs. McNeely

told him she did not have that much money with her; she had $300 cash with which she attempted to negotiate with Bomar. She told him McNeely was in Saudi Arabia and that she needed to get his car. Bomar arranged to call her the next morning.

On March 26, when Bomar failed to call her at the arranged time, Mrs. McNeely went back to Buy Direct. Bomar was not in; she waited for almost an hour, but he did not appear. She left and called the business that afternoon and asked for Doc. Bomar came to the phone and told her she did not have a car there and he did not want to talk to her, and he hung up the telephone. Mrs. McNeely testified that Bomar never asked her to provide the title to the car; he would have let her take the car if she had paid him the requested amount of money.

Other people contacted Bomar at Buy Direct on McNeely's behalf to attempt to get his car back. Chris Carnero (Carnero), a worker for Operation Dependent Shield, a foundation created to help the families of the reservists who were called to active duty, and Lee Woods (Woods), the chairman of the foundation, testified for the government.[5] Mrs. McNeely contacted Carnero on March 27 to seek the foundation's help in recovering the Camaro for McNeely, who was still in Saudi Arabia. On April 10, Carnero called Buy Direct and spoke with a person who identified himself as "Doc." Carnero told "Doc" that the McNeelys were willing to pay for the repairs on the Camaro. "Doc" replied that it would cost more than just the repair; he also wanted approximately $1,200 in storage fees and would not release the car until the bill was paid in its entirety. Carnero informed "Doc" that he would be violating federal law, the Soldiers' and Sailors' Civil Relief Act; Bomar responded that he just wanted his money. "Doc" rejected Carnero's attempt to negotiate the payment of part of the storage fees; in addition, he refused to consider holding the car without charging further storage fees. Following this conversation, Carnero tried to reach "Doc" again

---

5. The foundation provided such services as financial aid, counseling, legal services, medical help, and car repair.

but was unsuccessful. Carnero turned the case over to Woods.

Woods called Buy Direct on April 16, 1991, and spoke to a person who identified himself as "Doc." Woods explained the nature of his call, telling "Doc" that he hoped they could settle the problem of McNeely's car. "Doc" again insisted on payment of the full amount he claimed was owed him; he told Woods that there were storage fees on top of the repair charges, and he indicated that he had filed a lien on McNeely's car. Woods informed him that the lien was probably a violation of the Soldiers' and Sailors' Civil Relief Act. At this point in the discussion, "Doc" became angry and ended the conversation.[6]

While the McNeelys were attempting to get the Camaro back, Bomar was taking steps to perfect his interest in the car. Terri Stewart (Stewart), the office manager for the title division of U.S. Data Link in Baytown, Texas, testified that Buy Direct submitted a form authorizing U.S. Data Link to act as its agent in filing a lien for mechanic and storage fees on McNeely's car. Although this form expressly requested that storage charges he added to the lien, starting from January 3, 1991, U.S. Data Link was unable to obtain a storage lien because, under state regulations, it was required to obtain a release from the first lienholder, GMAC, before the mechanic's lien foreclosure could be processed; U.S. Data Link had not obtained this release and was therefore not able to obtain a lien for storage.[7]

On March 13, 1991, U.S. Data Link sent a notice of possessory lien to Meredith notifying her of its intent to foreclose on the car. The foreclosure was requested by Buy Direct. The notice provided that the amount owed was $194.50.

In May 1991, Bomar sold the Camaro for $1,800 to Jeffery Taylor (Taylor), the owner of J.T. Auto Sales, in Houston. Taylor had previously purchased two or three cars from Bomar, and Bomar did transmission work for Taylor's company. Bomar told him he had done some transmission work on the car and was selling it to recover his expenses. Taylor considered himself the owner of the vehicle, although he conceded that he did not have a certificate of title. Bomar gave him the notice of possessory lien, but Taylor never processed the notice; at first he was not sure what to do with the form, and later, once informed of the proceedings against Bomar, he waited until the matter could be cleared up.

## Proceedings Below

The single-count indictment charged that Bomar "did knowingly and willfully enforce and attempt to enforce a lien for storage of household goods and personal effects of" a person in military service, "to wit, a 1985 Chevrolet Camaro belonging to" McNeely, without first seeking an order by a court and return thereto made and approved by the court, in violation of 50 U.S.C. app. § 535(2), (3).[8] Bomar pleaded not guilty and proceeded to trial.

Following a two-day trial, the jury found Bomar guilty of the charged offense. In sentencing the defendant, the district court

---

6. According to Woods, "Doc" terminated their conversation with the words: "F— you. F— the government. F— the U.S. Army. F— Gordon McNeely."

7. It is unclear exactly why U.S. Data Link was unable to obtain the lien; at the time of the events in question here, McNeely had paid off the GMAC lien.

8. Section 535(2) of the Act provides, in pertinent part:

"No person shall exercise any right to foreclose or enforce any lien for storage of household goods, furniture, or personal effects of a person in military service during such person's period of military service and for three months thereafter except upon an order previously granted by a court upon application therefor and a return thereto made and approved by the court."

Section 535(3) provides:

"Any person who shall knowingly take any action contrary to the provisions of this section, or attempts so to do, shall be fined as provided in title 18, United States Code, or imprisoned for not to exceed one year, or both"

Prior to its March 18, 1991, amendment, section 535(3) was the same except that the wording following "shall be" was "guilty of a misdemeanor and shall be punished by imprisonment not to exceed one year or by fine not to exceed $1,000, or both."

accepted the factual findings and sentencing recommendation of the presentence investigation report and sentenced Bomar to 3 years' probation, with the special conditions of 6 months' home detention and 250 hours of community service. In addition, the court ordered him to pay $4,000 in restitution to McNeely and to return the car to McNeely free of charge.

Bomar appeals his conviction, challenging the sufficiency of the evidence in three specific respects.

### Discussion

■ Faced with a claim of insufficient evidence to support a conviction, we review the evidence, whether direct or circumstantial, and all the inferences reasonably drawn from it, in the light most favorable to the verdict. *United States v. Salazar,* 958 F.2d 1285, 1290–1291 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 185, 121 L.Ed.2d 129 (1992).

Bomar raises only three challenges to his conviction, claiming that there was insufficient evidence that he foreclosed or attempted to enforce a lien for storage, that McNeely was the owner of the car, and that he (Bomar) had not attempted to gain court approval of any foreclosure proceedings.

### I. Lien for Storage Charges

Bomar argues that the evidence is insufficient to prove that he foreclosed or attempted to enforce a lien for storage; he claims first that the lien was not for storage, and second, that he took no steps to enforce the lien.

■ In his original brief on appeal, Bomar contends that, to fall within the meaning of the Act, a lien must be limited to storage charges:

"[t]he plain terms of section 535 of [the Act] indicate the legislative intent to protect a servicemen's [sic] household goods, furniture, or personal effects when the ser-

vicemen [sic] left the items with the defendant *for the purpose of storing those items while the serviceman is on active duty.*" (Emphasis added.)

Bomar argues that the lien in question here was for mechanics fees, not for storage, and thus he cannot be guilty of violating the Act.[9] We disagree. The wording of the Act does not include an express requirement that a lien be solely for storage; rather it speaks of "*any* lien for storage." 50 U.S.C. app. § 535(2) (emphasis added). Nor may we read into the statute a requirement that the lien be restricted to (as opposed to include) storage fees. "The Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner,* 319 U.S. 561, 574, 63 S.Ct. 1223, 1231, 87 L.Ed. 1587 (1943). Certainly, in order to fall within the Act, a lien must include charges for storage, but the lien need not be limited to such fees.

■ Bomar's position that he did not have a lien for storage is not supported by Texas law. The Texas Property Code provides that a garageman with whom a vehicle is left for care has a lien on that vehicle for the amount of the charges for the care. TEX.PROP.CODE ANN. § 70.003(c) (Vernon 1993 Supp.). In addition, the Code authorized him to retain possession of the vehicle until the amount due under the repair contract, or reasonable and usual compensation in the event there is no contract amount, is paid. *Id.,* § 70.001(a) (Vernon 1984). The statute provides for the possessory lienholder, such as Bomar, to give notice of his interest in the car to the last known registered owner and each lienholder of record. *Id.,* § 70.004(a) (Vernon 1993 Supp.). Most importantly, the statute entitles the possessory lienholder to "reasonable storage fees for up to 5 days before the day the notice is mailed" and after the notice is mailed to "reasonable storage and preserva-

---

9. Bomar concedes that the form sent by Buy Direct authorizing U.S. Data Link to file a lien on the Camaro expressly listed both repair charges and storage charges of $15 per day. He argues, however, that he did not sign the form and thus the request cannot be attributed to him. The

form was signed by Yolanda McFarland, the secretary at Buy Direct. Although Bomar did not sign the form himself, the evidence adequately supports the inference that it was sent at his direction.

tion fees until the motor vehicle ... is removed and accrued charges are paid." *Id.*, § 70.004(c) (Vernon 1993 Supp.).

Thus, under Texas law, Bomar had valid grounds for asserting a lien for the storage of the Camaro.

Bomar next contends that he did not ultimately enforce the lien because he did not complete the steps necessary to foreclose the storage part of the lien. He argues that U.S. Data Link was unable to obtain a lien for storage on the Camaro because of the existence of a first lienholder. However, although the title search revealed a GMAC lien on the car, the lien had been paid off before these events occurred.

■ Bomar's argument ignores the fact that he can be liable under the "or attempts so to do" language of section 535(3) (see note 8, *supra* ) for *attempting* to foreclose or enforce the lien. The evidence of such an attempt is overwhelming. On several occasions, McNeely's mother and sister, as well as the representatives of Operation Defendant Shield, approached Bomar with offers to pay the repair charges due on the Camaro, as well as part of the accrued storage fees. Each time, Bomar refused to negotiate and demanded payment in full of amounts as high as $1,800 or $2,000.[10] These amounts far exceed the repair charges of $194.50, which were excessive to begin with and based, at least originally, on work which McNeely never authorized. Finally, when Bomar sold the car to Taylor for $1,800, he pocketed the entire amount.[11] He gave Taylor the notice of possessory lien, the form necessary to begin foreclosure proceedings on the car.

This evidence is clearly sufficient for a reasonable jury to determine that Bomar attempted to enforce a lien for storage of McNeely's Camaro.

## II. Ownership of the Car

Bomar's next challenge to his conviction is that Meredith, not McNeely, was the owner of the Camaro; because she was not in military service, he argues, any attempt to foreclose on a storage lien on her car could not be a violation of the Act. McNeely conceded at trial that the title to the car was still in Meredith's name; neither he nor his sister had taken steps to transfer the title to him.

■ Under Texas law, *bona fide* car sales are valid as between buyer and seller even when they have not complied with the provisions of the Texas Certificate of Title Act, TEX.REV.CIV.STAT.ANN. art. 6687–1 (Vernon 1977). *See United States v. Gunter*, 876 F.2d 1113, 1117 n. 4 (5th Cir.), *cert. denied*, 493 U.S. 871, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989). Although McNeely admittedly did not comply with the legal requirements of transferring the title, the jury could have concluded that he owned the vehicle. There was no dispute at trial between McNeely and Meredith that McNeely had purchased the car in 1988. McNeely testified that he made cash payments to his sister for her remaining payments to GMAC; the car was paid off in March 1990. Prior to December 15, 1990, McNeely had paid all outstanding debt on the car to GMAC or Meredith. McNeely, with his mother's help, paid for all repairs needed. After selling the car to her brother, Meredith did not use her own money for payments, nor did she pay for gas, repairs, or insurance for the vehicle. McNeely explained the failure to transfer the title as an attempt to avoid paying additional finance charges to GMAC. There was sufficient evidence for the jury to find that McNeely owned the Camaro at the time he took it to Buy Direct for repairs.

---

10. Bomar attempts to argue that he would not release the car to McNeely's mother or sister because they were not the owner of the car or had not brought the car in for service. Not only does this argument contradict his contention that Meredith, not McNeely, was the owner of the car, it conflicts with testimony that Bomar would have released the car if paid the full amount he claimed was due.

11. Ms. Stewart at U.S. Data Link testified that the mechanic's lien here was for $194.50; if the vehicle sold for any figure over that amount, the excess would go to the first lienholder (here, GMAC), if the first lien was outstanding, and then to the owner of the car. In the event that the owner could not be located, the money would go to the state.

## III. Court Records

■ Bomar claims that the government did not prove that he failed to apply for a court order allowing foreclosure on the lien on McNeely's car or to receive court approval for such a proceeding.

At trial, the government called Maria O. Makinen, a small claims court clerk at Precinct One, Position Two, in Harris County, Texas; Abe Martinez, the chief assistant of the Harris County District Court Clerk's office; and Melissa Steinbacher, the operations manager for the Clerk's Office for the United States District Court. Each of these witnesses testified that searches of the records of their respective courts for the months of December 1990 through May 1991 had revealed neither an application for, nor a court order granting, permission for Bomar or Buy Direct to foreclose upon a lien against any person. Bomar challenges the completeness of this evidence.[12]

We conclude that the evidence submitted by the government is sufficient for a reasonable jury to conclude that Bomar did not take steps to attain court approval of any foreclosure proceedings. The jury had before it voluminous evidence of Bomar's course of conduct in this matter, including evidence that although warned that his actions could constitute a violation of the Act he continued to pursue the full payment of storage fees. None of this evidence contains any hint of any actual, contemplated, threatened, or claimed court proceedings.

We hold that, taken in its entirety, the evidence was sufficient in this respect.

## IV. Household Goods, Furniture, or Personal Effects

■ Finally, although this issue was not raised by the defendant either before the district court or on appeal, we consider the question of whether McNeely's Camaro is within the Act's coverage of "household goods, furniture or personal effects."[13] This is a question of first impression.[14] As noted, the Act is to be liberally construed to protect those in military service. *Boone.*

■ In *Arthur v. Morgan,* 112 U.S. 495, 5 S.Ct. 241, 28 L.Ed. 825 (1884), the Court held that a family's carriage was covered by the term "household effects" as used in the statute exempting from customs duties "Books, household effects, or libraries, or parts of libraries, in use, of persons or families from foreign countries." In *Hillhouse v. United States,* 152 F. 163 (2d Cir.1907), the Court, relying on *Arthur,* held that an automobile was "household effects" within the then more recent statutory exemption from customs duties for "Books, librarises [sic], usual and reasonable furniture, and similar household effects of persons or families from foreign countries ... not intended for any other person or persons, nor for sale."[15] We can

---

12. Bomar argues that the small claims court was not the proper venue and would not have had any records of such a proceeding. In addition, Abe Martinez admitted on cross-examination that his office contained records only for the civil district courts in Harris County, not the county courts. Ms. Steinbacher conceded that her search of the federal court records would not have located the enforcement proceeding if it was ancillary to another court matter. Finally, Bomar tries to discredit Ms. Steinbacher's testimony on the technical grounds that she failed to indicate the particular district for which she held the position. Counsel did not elicit a clarification of this matter. Presumably, she is the operations manager for the United States District Court for the Southern District of Texas, the district court which encompasses Houston.

13. Counsel for the defendant at oral argument stated that she considered the car to be a personal effect.

14. Indeed, to our knowledge, there are no cases discussing a violation of this particular section of the Act at all.

15. In *United States v. W.R. Grace & Co.,* 166 F. 748 (2d Cir.1909), the court distinguished *Hillhouse* and held that under the quoted statute an automobile was not exempt, stating:

> "The insertion of the word 'similar' indicates that Congress intended to do away with the exemption of household effects *generally,* and to restrict it to such as should be like books, libraries, or household furniture. We think that automobiles cannot be said to be similar to books, libraries, or to usual and reasonable household furniture, or either of them." *Id.* at 749.

Here, however, the Act plainly does encompass household goods "generally."

see no substantial difference between "household goods," as used in section 535(2), and "household effects" as used in the statute under consideration in *Arthur*. [16]

We note that while the term "personal effects" has in some state decisions, principally will cases, been construed to exclude automobiles on the theory that the term is restricted to tangible property worn or carried about the person or having some intimate relationship to the person, *Matter of Estate of Roddy*, 784 P.2d 841, 843 (Col.App. 1989), in other such cases the term has been held to include automobiles. *See, e.g., In re Jones' Estate*, 128 Misc. 244, 218 N.Y.S. 380 (N.Y.Surrogate Ct.1926) (two automobiles within the will's bequest of " 'personal effects' "); *In re Ginnever's Estate*, 69 N.Y.S.2d 452 (N.Y.Surrogate Ct.1947) (motor boot within bequest of " 'my other personal and household effects' "). The decisions go both ways and are likely not entirely reconcilable. *See* Ann. 30 A.L.R.3d 797 at 825–26, 836–38 (1970).[17] As has been pointed out, much depends on the context. *See In re Burnside's Will*, 185 Misc. 808, 59 N.Y.S.2d 829 (N.Y.Surrogate Ct.1945).[18] For this reason, the Supreme Court in *Arthur* observed that "no material aid can be derived from decisions in regard to wills" as the construction there "often depends largely on the

**16.** *See, e.g., In re Mitchell's Will*, 38 N.Y.S.2d 673, 675 (N.Y.Surrogate Ct.1942) ("[t]he word 'effects' is nearly synonymous with 'goods' ...").

**17.** This annotation states "[a] number of cases have held that the term 'personal effects' or 'effects' ... in the wills being construed, passed automobiles or other motor vehicles," *id.* at 836, and "[a] number of cases have held that the term 'personal effects' ... in the wills being construed, did not pass automobiles or other motor vehicles." *Id.* 59 N.Y.S.2d at 838.

**18.** In *Burnside's* the court held that the thirty-fourth clause of the will leaving to seven different persons " 'the residue of my household goods and personal effects' " did not include an automobile, because the preceding thirty-three clauses made specific bequests of specific items such as rugs, tables, spoons, a bracelet, a mirror, a vase, a bureau, etc. The court observed:

"After having laboriously distributed among many persons carefully selected items of household goods and personal effects, the testatrix reached the thirty-fourth clause, and to several different persons gave 'the residue of my household goods and personal effects.'

The Court is irresistibly drawn to the conclusion that the household goods and personal effects which the testatrix had in mind when she reached the thirty-fourth clause were in the same class as those particularly itemized in the preceding clauses. We conclude that she did not intend to include the automobile in the thirty-fourth clause. In numerous decisions, expressions such as 'personal effects' and 'household goods' have received a wider or narrower interpretation by reason of other provisions in the will, the doctrine of ejusdem generis being applied. See *Estate of Lippincott*, 173 Pa. 368, 34 A. 58; *Matter of Steimes' Estate*, 150 Misc. 279, 270 N.Y.S. 339; *Child v. Orton*, 119 N.J.Eq. [Eq.] 438, 183 A. 709, supra.

It appears from the records of this court that many of the personal effects specifically itemized are of comparatively slight value, while the automobile in question has been sold for sixteen hundred dollars ($1,600). The testatrix could not expect seven persons widely separated to enjoy jointly one automobile. One machine cannot be divided among seven persons, and the residue of household goods and personal effects is not sufficiently valuable so that the automobile might be allotted to one person and still make a proportionate distribution to the other six." *Id.* 59 N.Y.S.2d at 832–33. However, the court recognized that absent such special contextual considerations, the result would have been otherwise. Thus, it stated:

"When disassociated from other provisions in the will, the expression 'personal effects' clearly includes an automobile owned and used by a testator at the time of his death. See *Matter of Jones' Estate*, 128 Misc. 244, 218 N.Y.S. 380; *Matter of Winburn's Estate*, 139 Misc. 5, 247 N.Y.S. 584; *Matter of Thompson's Estate*, 218 App.Div. 130, 217 N.Y.S. 865 affirmed on other grounds, 245 N.Y. 565, 157 N.E. 859. Similarly, the expression 'household effects' has been construed as including an automobile (*Hillhouse v. United States*, 2 Cir., 152 F. 163) or a carriage (*Arthur v. Morgan*, 112 U.S. 495, 5 S.Ct. 241, 28 L.Ed. 825).

The expression 'household goods' may narrowly be construed as applying only to articles in the house as distinguished from those in a garage or other outbuilding, but this narrow interpretation has not always prevailed, and an automobile kept in a detached garage has been held to be 'household goods.' *Matter of Mitchell's Will*, Sur., 38 N.Y.S.2d 673. Similarly, a will giving 'my house (homestead) and contents of all kinds' has been interpreted as including an automobile and tools which were kept in a stable which was situated on the testator's homestead premises. *Cowan v. Cowan*, 90 N.H. 198, 6 A.2d 179, 180. Also a will bequeathing 'articles of personal, domestic, or

meaning of words in other provisions in the will." *Id.*, 112 U.S. at 498, 5 S.Ct. at 243. We do note, however, that a recognized legal dictionary defines "personal effects" so as to include automobiles,[19] and we have so used the term in several of our opinions.[20] Certainly, the presence of the words "personal effects" and "furniture" in section 535(2) does not suggest a narrow construction for their companion phrase there "household goods."

It appears to us that, taken together, section 535(2)'s reference to "household goods, furniture, or personal effects" is intended to embrace a broad category of tangible personal property held by military personnel for their personal use, as opposed to for business or investment use.[21] In this context, it is entirely appropriate to follow *Arthur* and *Hillhouse* and conclude that a soldier's personal automobile is part of his "household goods" for purposes of section 535(2).[22]

We hold a soldier's personal automobile, such as McNeely's Camaro, is within the Act's coverage of "household goods, furniture, or personal effects."

## Conclusion

For the reasons stated, Bomar's conviction and sentence are

AFFIRMED.

---

household use' has been thought to include an automobile." *Id.* 59 N.Y.S.2d at 831–32.

19. Black's Law Dictionary (6th ed. 1990):

"Personal effects. Articles associated with person, as property having more or less intimate relation to person of possessor; 'effects' meaning movable or chattel property of any kind. Usual reference is to such items as the following owned by a decedent at the time of death: clothing, furniture, jewelry, stamp and coin collections, silverware, china, crystal, cooking utensils, books, *cars*, televisions, radios, etc." *Id.* at 1143 (emphasis added).

20. *See, e.g., In re Crist*, 632 F.2d 1226, 1228 (5th Cir.1980) (in divorce context, describing transfer of "certain personal effects, including ... an automobile"), *cert. denied*, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 529 n. 8 (5th Cir.1962) (quoting complaint referring to automobile *"and other personal effects "*) (emphasis added); *Scofield v. Mauritz*, 206 F.2d 135, 137 n. 2 (5th Cir.1953) (quoting district court findings concerning "personal effects *like* ... personal automobiles") (emphasis added).

21. *See also Estate of Bloomingdale*, 142 N.Y.S.2d 781 (N.Y.Surrogate Ct.1955) (bequest of "all my personal belongings and effects, and all my household and house furnishings and effects" included yacht and six automobiles); *In re Mitchell's Will*, 38 N.Y.S.2d 673 (N.Y.Surrogate Ct.1942) (bequest of "All of my jewelry, clothing, personal effects, bric-a-brac, paintings, works of

art and all household goods and household furnishings of every description" includes automobile; apparently as "a part of her 'household goods.'" *Id.* at 675); *Goggans v. Simmons*, 319 S.W.2d 442 (Tex.Civ.App. Ft. Worth, 1958, n.r.e.) (provision in will concerning "the furnishings therein [referring to house described in will] and, all my personal belongings" covers testator's automobile).

22. We recognize that the term "household goods" in 11 U.S.C. § 522(f)(2)(A) has been held not to include motor vehicles. *See, e.g., Smith v. Avco Financial Services*, 29 B.R. 345 (Bankr. M.D.Pa.1983). But, this is because 11 U.S.C. § 522(d)(2) expressly covers "one motor vehicle," and that is hence clearly excluded from 11 U.S.C. § 522(d)(3), which (except for "jewelry," which is specified in § 522(d)(4)) lists the very same items as are listed in § 522(f)(2)(A). Moreover, the extensive particularized listing in § 522(f)(2)(A) ("household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry ... held primarily for the personal, family or household are ...") is also thought to point to the same result. *See Smith* at 346 (" 'the inclusion of the debtor's interest in a motor vehicle in § 522(d)(2), and the omission of any mention of a motor vehicle in § 522(f)' " and " '[s]ince the statute lists goods to be included within the meaning of "household goods," the statute necessarily must be narrowly construed' "). *See also In re Vale*, 110 B.R. 396, 404 (Bankr. N.D.Ind.1989) ("motor vehicles are expressly provided for in § 522(d)(2), while § 522(f)(2)(A),

(B) and (C) makes no reference to motor vehicles"). We do not quarrel with any of these cases. However, none of the considerations which were influential in them are present here.