Venson Eugene **WILLIAMS**, Appellant,

v.

A. L. **DUTTON**, Warden of the State Prison at Reidsville, Georgia, Appellee.

No. 25349.

United States Court of Appeals Fifth Circuit.

Aug. 20, 1968.

798

Lynn A. Downey, Atlanta, Ga., for appellant.

Alfred L. Evans, Jr., Asst. Atty. Gen., Atlanta, Ga., for appellee.

Before GEWIN and THORNBERRY, Circuit Judges, and EDENFIELD, District Judge.

GEWIN, Circuit Judge:

Sometime in the early morning hours of April 17, 1964, three police officers were brutally shot to death and left lying in a pine thicket in Gwinnett County, Georgia. A year and a half later, appellant Venson Eugene Williams was tried before a jury in the Gwinnett County Superior Court for the murder of one of the officers. He was convicted and sentenced to die in the electric chair. After exhausting all his state remedies,[1] Williams filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Georgia, alleging that his confinement in the state penitentiary was unlawful in that his conviction had been obtained in violation of his fourteenth amendment rights. The district court denied the relief sought in the habeas corpus petition [2] and Williams has perfected an appeal to this court. We reverse the de-

1. The Supreme Court of Georgia affirmed the conviction, Williams v. State, 222 Ga. 208, 149 S.E.2d 449 (1966), and the United States Supreme Court denied Williams' petition for a writ of certiorari, Williams v. Georgia, 385 U.S. 887, 87 S. Ct. 184, 17 L.Ed.2d 115 (1966).

2. The opinion and order of the district court are unreported.

cision of the district court and remand the case with instructions.

The precise details of the murder involved in this case are not pertinent to the questions raised. We shall therefore summarize the facts which the jury was warranted in finding. Appellant Williams and one Truett owned a garage in Hartsville, South Carolina, where they were engaged in the business of rebuilding wrecked automobiles. Early in 1964, they purchased a maroon-colored 1963 Oldsmobile which had been damaged on the left side and rear. They concluded that the car could not be resold at a profit if they had to purchase the repair parts. Therefore, with the help of one Evans, they located and stole a substantially identical Oldsmobile in Atlanta, Georgia. Returning to Hartsville, the three men stopped on a back road in Gwinnett County in order to put new registration plates and a new ignition switch on the stolen car. Responding to a police call reporting suspicious activity, three Gwinnett County police officers accosted the car thieves. While being questioned by the officers, Evans grabbed the gun from one of the officers, the other two were then disarmed, and all three of them were bound together with their own handcuffs. Williams and Evans then took the officers into a little wooded area off the road and shot each officer a number of times, mostly in the back of the head. The stolen Oldsmobile was driven off the road and set afire and the three car-thieves-turned-murderers slinked away in the night, leaving the lifeless bodies and the burning car.

Although Williams, Evans, and Truett had been prime suspects very early in the investigation, more than a year went by before charges were filed against them. The difficulty encountered by the investigating officers was in discovering more than circumstantial evidence connecting the suspects with the crime. The breakthrough came when Truett, on a promise of immunity from prosecution, agreed to confess participation in the crime and to testify on behalf of the prosecution.

The trial court denied appellant Williams' pretrial motion for production of the following materials: (1) a writing "promising immunity from prosecution or preferential treatment, sentence or reward to Wade L. Truett"; (2) a writing "promising immunity from prosecution or preferential treatment, sentence or reward to Marion C. Perry"; (3) the names of the witnesses before the grand jury which returned the indictment against him; (4) the names of persons whose testimony was given to the grand jury by or through someone else; (5) the written statements of all witnesses given to the prosecution;[3] (6) the names of the police officers who questioned Williams' wife; (7) the substance of the information given to the police officers by Williams' wife, particularly the date she told them she last saw her husband during the month of April 1964; (8) the record of the grand jury proceedings; and (9) the names and, apparently, the whereabouts of all witnesses to be called by the state.

Williams contends that the denial of his production motions violated rights protected by the due process clause of the fourteenth amendment. He asserts that the refusal to produce the demanded evidence was equivalent to a suppression of evidence. In Brady v. State of Maryland,[4] the Supreme Court stated:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punish-

---

3. During the trial, after the evidence established that Truett and Perry had given written statements to the prosecutor, counsel for Williams again moved for their production for use in the cross- examination of those witnesses. The trial court denied the motions.

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

ment, irrespective of the good faith or bad faith of the prosecution.[5]

The *Brady* decision culminates a series of cases in which the Court proscribed the use by the prosecution of perjured testimony and the active suppression of exculpating or favorable evidence.[6] It is now clear that *Brady* imposes an affirmative duty on the prosecution to produce at the appropriate time requested evidence which is materially favorable to the accused either as direct or impeaching evidence.

■ Appellee insists that *Brady* is inapplicable to the present case because there has been no showing that the evidence demanded was favorable to Williams. We think, however, that due process of law cannot be sidestepped by such a facile distinction. The *Brady* quandary presented by this case is not new to this court. In Guerrero v. Beto,[7] the court remanded the case to the district court for a plenary hearing to determine whether the demanded evidence was favorable to the accused. In the circumstances of this case,[8] we think that the question should be determined *in camera* by the state courts.[9] If, after examination of the demanded evidence, the state court determines that favorable evidence "material either to guilt or to punishment" has been suppressed, then Williams must be granted a new trial.[10]

■ We realize that this requirement places an added burden on the trial court and it is with great reluctance that we impose it. However, we think that the alternative procedures for safeguarding the rights of criminal defendants are undesirable. The right of the accused to have evidence material to his defense cannot depend upon the benevolence of the prosecutor.[11] Likewise, we reject ap-

---

5. 373 U.S. at 87, 83 S.Ct. at 1196.

6. See Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ; Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957) ; Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942) ; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam).

7. 384 F.2d 886 (5th Cir. 1967) (per curiam).

8. As indicated hereinafter, this case must be returned to the state courts for a redetermination of the sentence in accordance with the Supreme Court's recent decision in Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

9. The Supreme Court approved a similar procedure in Jackson v. Denno, 378 U.S. 368, 396, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). See also Buchalter v. People of State of New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943), where the Court approved *in camera* inspection by the state court of appeals of allegedly suppressed evidence.
 Additionally, in the interest of state-federal relations, we think that comity requires that the state courts determine this question. See Peters v. Rutledge, 5th Cir. 1968, 397 F.2d 731; Moore v.

Dutton, 5th Cir. 1968, 396 F.2d 782; State of Texas v. Payton, 390 F.2d 261 (5th Cir. 1968).

10. See Ashley v. State of Texas, 319 F.2d 80 (5th Cir.), cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963). In his concurring opinion in Giles v. State of Maryland, 386 U.S. 66, 100, 87 S.Ct. 793, 810, 17 L.Ed.2d 737 (1967), Mr. Justice Fortas stated:
 If it [the prosecution] has in its exclusive possession specific, concrete evidence which is not merely cumulative or embellishing and which may exonerate the defendant or be of material importance to the defense—regardless of whether it relates to testimony which the State has caused to be given at the trial—the State is obliged to bring it to the attention of the court and the defense.
 Assuming the existence of the given item, the state court should examine *in camera* the following demanded materials: the writings promising immunity; the written or recorded statements of witnesses; and the record of the grand jury proceedings. We leave it to the discretion of the State court to determine whether the other materials demanded require examination.

11. Numerous regrettable instances of prosecutorial misconduct attest to the impracticability of this approach. See, e. g., note 6 supra; Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17

pellant Williams' contention that the prosecution's files should have been open to him. Since a criminal defendant cannot be compelled to incriminate himself,[12] discovery in a criminal trial must necessarily be substantially unilateral. We think that unlimited discovery of the state's files would unduly impair effective prosecution of criminal cases. On the other hand, since the investigative resources of the state are generally far superior to those of the defendant, a total exclusion of the accused from the evidence gathered by the prosecution also seems unwarranted. We therefore think that the procedure which we adopt in this case is a necessary compromise of the conflicting interests of state and accused.

Williams next contends that the trial court violated due process when it denied his motion for a change of venue, because "[t]he entire jury panel had been subjected to such prejudicial publicity that the accused did not obtain a fair trial." The newspaper clippings and other facts relative to the alleged prejudicial publicity are not in the record before this court. There does not, however, appear to be any substantial disagreement as to the facts in the parties' briefs. We shall, therefore, give appellant Williams the benefit of any doubt by quoting the pertinent facts from his brief:

> From the morning of April 17, 1964 [when the policemen's bodies were discovered], for a period of two weeks, every detail of the case was related, the stories of witnesses, descriptions of the scene and of the bodies, the activities and discoveries of various investigative officers and their speculations and theories as to the motives and manner of commission of the crimes. Then, for a while, the publicity died out, except for a brief flare

when some apparently false leads stirred speculations of a solution. It was not until June, 1965, that a full blast of news coverage again broke loose, following an announcement on June 25, 1965, by the Governor of the State that the murders were "solved" (Atlanta Journal, June 25, 1965). On the morning of June 26, 1965, the headlines informed the public, including the prospective jurors whoever they were to be, that all three suspects were criminals then serving time for other crimes (Atlanta Constitution, June 26, 1965).

On July 1, 1965, the news media for the first time identified the accused persons, including the Appellant, Venson Eugene Williams. A "mug shot" adorned the front page of that day's Atlanta Journal and his prior record was reported in full. The Atlanta Constitution of July 2, 1965, gave an equally lurid and complete presentation. The local papers published in Lawrenceville, the County Seat of Gwinnett County, Georgia, as well as radio and television facilities serving Gwinnett County multiplied the coverage and deepened the impression on the minds of all the fine people of Gwinnett County that indeed the crime was "solved" and that three hardened criminals, this defendant, Williams, among them, had committed the crime and were only waiting for the verdict which thereby became inevitable.

Counsel for Williams has shown astuteness in not placing great reliance upon Sheppard v. Maxwell,[13] for that case is clearly unhelpful to his cause. The massive pressures exerted by the press in *Sheppard,* both before and during the trial, find no parallel in this case. The jury here was sequestered throughout the trial. The court gave the jurors

L.Ed.2d 737 (1967); United States ex rel. Thompson v. Dye, 221 F.2d 763, (3d Cir. 1955); United States ex rel. Almeida v. Baldi, 195 F.2d 815, 33 A.L.R.2d 1407 (3d Cir. 1952); Application of Kapatos, 208 F.Supp. 883 (S.D.N.Y.1962); Smallwood v. Warden, 205 F.Supp. 325 (D. Md.1962).

12. Cf. Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

13. 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

repeated warnings about outside comments on the case and gave the bailiffs careful instructions to permit outside contact only through them and to make sure that the jurors did not accidentally see a newspaper headline concerning the case. It is thus clear that publicity during trial had virtually no effect on the jury. Moreover, it may be said with certainty that the record proof does not show that pre-trial publicity adversely affected the jury. The only pre-trial publicity which possibly could have had an adverse effect on Williams was the statement by the governor of the state that the crime had been solved and the disclosure of his prior criminal record.

 The main thrust of the *Sheppard* case was quoted by the Supreme Court from Estes v. Texas: [14]

> It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process. [15]

The "inherently prejudicial publicity which saturated the community" and the incredible courtroom disruptions in *Sheppard* compelled a presumption that the trial had not been in accordance with due process of law. In the present case, we find neither the saturation of prejudicial publicity nor the courtroom disruptions. The presumption compelled in this case, therefore, is that due process was satisfied.

Apparently recognizing that he must show actual prejudice, Williams has attempted to marshall sufficient facts to bring this case within the terms of our Juelich v. United States[16] decision. This court there found that the qualification proceedings conclusively showed that the jury had not been impartial.[17] A careful reading of the jury qualification proceedings in this case convinces us that Williams' reliance on *Juelich* is unfounded. In his brief, he states that "eleven jurors were excused by the trial court because of their fixed opinions as expressed upon interrogation. There were thirteen others objected to who believed that the defendant had a criminal record." The record does not fully support these statements. Of the ninety-six [18] veniremen on the jury panel, only one, juror Sammon, expressed a fixed opinion as to the guilt or innocence of the accused, and he was challenged by the prosecutor and excused by the court. Seven jurors were excused because they expressed fixed opinions that Williams had a prior criminal record. Two jurors

---

14. 381 U.S. 532, 542, 85 S.Ct. 1628, 14 L. Ed.2d 543 (1965).

15. 384 U.S. at 352, 86 S.Ct. at 1517.

16. 214 F.2d 950 (5th Cir. 1954).

17. The facts upon which the court's decision rested were as follows:

From the record it appears that eighty-one jurors composed the panel in this case. Of these, ten were excused; fifty-one testified they were of the opinion that both defendants were engaged in killing the officer; twelve were of the opinion that either or both were guilty; two were of the opinion Juelich was the guilty party; while six had no opinion.

Each of the twelve jurors empaneled to try the defendant testified on voir dire examination that from reading the newspapers, listening to newscasts over the radio and television, or discussions, he had formed an opinion that the defendant was guilty.

214 F.2d at 952.

18. Appellee states in his brief that the panel contained ninety-six jurors, but our own examination of the record discloses as many as ninety-eight jurors. Since eight panels of twelve were called, the total should have been ninety-six. However juror McMillan was excused because of service on the grand jury and replaced on the twelve man panel. Another juror, Brand, seems to have been excused but never actually called. We accept the number ninety-six for purposes of this opinion.

were excused because their families were related to one of the deceased officers.[19]

It is true that most of the jurors had read the newspaper articles which we have already discussed. But this is hardly sufficient to show bias. Williams points out that two veniremen, Clack and Howington, who were not disqualified by the trial court expressed opinions that the return of the indictment in the case had solved or would "lead to the solving of" the crime. However, each stated that he had no opinion concerning the guilt or innocence of the accused.[20] Moreover, we do not agree

19. The other excusals were as follows: thirty-three for conscientious objection to capital punishment; one for sickness; one for general health reasons; and one because he was then serving on the grand jury. In addition, juror Ivey appears to have been excused although the reason is unclear; and juror Brand appears to have been excused because of scruples against capital punishment, although it is not clear that he was ever called. In any event, we attach no great significance to precise numbers in this context. Our decision in this case would not be different even if we assumed the correctness of appellant Williams' figures.

20. It may be noted that Williams' counsel peremptorily challenged both Clack and Howington and neither sat on the trial of the case.

The pertinent part of the examination of juror Clack was as follows:

Q Do you remember or did you hear any statements attributed to the Governor of the State and Solicitor-General of this circuit to the effect that the return of these indictments had solved this crime?
A I did.
Q And do you believe that to be true, sir?
A Yes, sir.
Q You do believe that to be true?
A Yes, sir.
Q The return of these indictments has solved the crime?
A Yes, sir, I do.
Q Mr. Clack, is that a fixed opinion?
A No, sir, it's not fixed.
Q But you do believe it? You do believe it?
A I believe what the paper says.
Q Now, would it take evidence to overcome that?
A That's correct.
Q In other words, the defendant would have to produce evidence of his innocence in order for you to overcome that fixed—that opinion?
A Correct, yes, sir.

Mr. Clack was then questioned by the state's attorney as follows:
Q Mr. Clack, you are stating that in the questions—or did you see the crime committed?
A No, sir.
Q Have you heard any sworn evidence?
A No, sir.
Q Then you have not fixed any opinion in your mind whatsoever based upon seeing the crime committed or from hearing any sworn evidence given in the case?
A I have not.
Q Is your mind subject then to and receptive to the evidence in the case?
A Yes, sir.
Q Or—are you predisposed toward— against this defendant or have you fixed your mind, in your mind that he is guilty?
A I have not.
Q Do you think that you can listen to the evidence in this case and that you can fairly and properly construe the law that the court gives you in the charge and that you can do what is right between the State of Georgia and between the, this Defendant?
A I do.
Q Do you have any reservations in your mind that you would not be a fair and impartial juror?
A No, sir.

The pertinent part of the examination of juror Howington was as follows:
Q For example did you hear it in any news broadcast story, hear it stated that the Governor or Solicitor-General of this County had stated that the return of these indictments have solved the killing of these officers?
A I heard it.
Q You believe that to be true?
A Yes.
Q You do believe the return of the indictments has solved it?
A No, sir.
Q What do you believe in regard—
A I believe the return of the indictments will lead to the solving of it.
Q Will lead to the solving?
A Right.

with Williams' count of the jurors who were convinced that he had a prior criminal record. Excepting the seven jurors disqualified by the court, all but one of the jurors questioned denied having a fixed opinion as to Williams' criminal record. The one juror who did not deny having a fixed opinion on the criminal record, juror Wood, testified as follows:

> THE COURT: . . .. Mr. Wood, do you have any fixed opinion as to any past record of this defendant?
>
> JUROR WOOD: Yes, sir.
>
> THE COURT: Is that fixed opinion to such an extent that you would carry it with you to the Jury room and it be necessary for him to overcome from the evidence in the trial of the case?
>
> JUROR WOOD: I see that it has no bearing on this case.
>
> THE COURT: You will try this case based on facts and evidence as you hear it in this case?
>
> JUROR WOOD: Yes, sir.
>
> THE COURT: The fact that this man has or has not a record make any difference in the opinion of your verdict?
>
> JUROR WOOD: No, sir.

■ In Irvin v. Dowd,[21] the Supreme Court established the guidelines applicable to jury qualifications. The principles enunciated there show the vacuity of Williams' contentions:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.[22]

The trial court's findings of impartiality should be set aside only where prejudice to the accused is manifest.[23] We are satisfied that no such prejudice exists in this case.

■ Williams further contends that the trial court denied him due process of law by excluding from the jury all persons who expressed conscientious scruples against the death penalty. The Supreme Court has recently held in Witherspoon v. State of Illinois[24] that

> a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

The rationale of the *Witherspoon* decision is that a jury from which persons with scruples against the death penalty have been excluded does not represent

---

> Q In other words, the trial of the indictments, you believe the person named or persons named are the persons guilty?
> A No.

21. 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

22. 366 U.S. at 722–723, 81 S.Ct. at 1642–1643.

23. Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Ex parte Spies, 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80 (1887); Hopt v. (Utah), 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1886).

24. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

a fair cross section of the sentiment of the community. It should be noted, however, that *Witherspoon* concerns only the exclusion of persons who merely assert conscientious scruples against capital punishment. It does not proscribe the exclusion of a venireman who states unequivocally that he would never impose the death penalty or that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt. Additionally, the Court made clear that the exclusion of jurors in violation of *Witherspoon* does not invalidate the conviction, but only the death sentence.

The jury qualification record before this court shows clearly that thirty-three veniremen were excluded when they indicated that they were conscientiously opposed to capital punishment.[25] Therefore, the sentence of death imposed upon Williams cannot stand. The case must be returned to the state courts for resentencing in accordance with the *Witherspoon* mandate.

During the trial counsel for Williams objected to the testimony of Truett, an alleged coconspirator. According to Truett's testimony, he had participated in the crime as a principal in the second degree; that is, while he had taken an active part in the theft of the automobile, he was not an actual perpetrator of the murder. At the time of the trial, in October 1965, Truett was under a federal sentence for theft of a shipment of whiskey, the sentence to expire in December 1965. In order to procure Truett's testimony in behalf of the state, he was promised immunity from prosecution and assistance in seeking parole from the federal penitentiary. The prosecutor made a candid statement informing both the court and the jury of these promises.

Williams contends that these promises rendered Truett's testimony so untrustworthy that due process of law required its exclusion from evidence. We disagree. There is no doubt that an outright purchase of testimony amounting to bribery would constitute a fatal taint. However, where the circumstances show that the benefit given or promised is not in the nature of a bribe,[26] the testimony is sufficiently trustworthy to be admitted in evidence. We agree with the Supreme Court of Georgia that the inducements in this case go to the witness' credibility.[27] The jury here was fully informed of the promises and, therefore, it was in a position to weigh the testimony in light of all the circumstances.

Williams' last contention is that the district court committed error when it denied his motion for further discovery in the habeas corpus proceeding. Our disposition of the other questions raised in this case makes it unnecessary for us to reach this issue, and we decline to deal with it prematurely.

In view of the foregoing, it is clear that Williams was entitled to some of the relief requested in his habeas corpus petition. Accordingly, the decision of the district court denying the petition is reversed. The case is remanded to the district court with instructions to enter appropriate orders to permit the state courts to correct the errors we have pointed out. If the state courts determine that evidence favorable to Williams was unlawfully suppressed, he must be granted a new trial. If, on the other hand, such evidence was not suppressed, the state courts must then resentence Williams in accordance with the mandate of Witherspoon v. State of Illinois.

Reversed and remanded.

---

25. The question propounded to the jurors was generally phrased simply: "Are you conscientiously opposed to capital punishment?"

26. Bullock v. United States, 384 F.2d 747 (5th Cir. 1967) (fees paid to informers).

See United States v. Ford, 99 U.S. 594, 595, 25 L.Ed. 399 (1878) (dictum).

27. Evans v. State, 222 Ga. 392, 403, 150 S.E.2d 240, 249 (1966).