**UNITED STATES of America, Plaintiff,**

v.

**Lawrence E. RAMMING, John Thomas Cloud, Fred E. Wiggins, Jr., Robert A. Briggs, Scott H. Phillips, John A. Herrin, James L. Emerson, Thomas A. Fry, III, Thomas J. Lykos and Paul Licata, Defendants.**

**Criminal A. No. H–94–181.**

United States District Court, S.D. Texas, Houston Division.

Jan. 12, 1996.

United States Attorney's Office, Washington, DC, for U.S.

Dan L. Cogdell, Houston, TX, for Lawrence E. Ramming.

Michael W. Ramsey, Houston, TX, for John Thomas Cloud.

Terry Collins, Harrisburg, PA, for Fred E. Wiggins.

Robert Shults, Stephen Lemmon, Houston, TX, for Robert A. Briggs.

Jack Zimmerman, for Scott H. Phillips.

Wendell Odom, Houston, TX, for John A. Herrin.

William Burge, Baltimore, MD, for James L. Emerson.

Chris Bacon, for Thomas A. Fry, III.

Theo Pinson, Houston, TX, for Thomas J. Lykos.

Robert Moen, Vancouver, BC, Canada, for Paul Licata.

## ORDER OF DISMISSAL

HOYT, District Judge.

This criminal case arises out of various financial transactions that occurred between Memorial and Wilcrest National Banks, Oxford Funding Corporation and various third party corporations. The defendants have moved for an judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and dismissal based on prosecutorial misconduct. As well, there is a pending motion to suppress the evidence seized pursuant to a search warrant because there was no probable cause for its issuance.

Having heard the evidence, reviewed the appropriate documents and exhibits and taken into consideration the previous arguments from all sides, the Court is of the opinion that both the motion for acquittal and the motion to dismiss based on prosecutorial misconduct shall be granted. The motion to suppress shall be denied.

### I.

**The Indictment:**

In the first of a 27 count indictment, the government charges the defendants with conspiracy to defraud federally insured financial institutions by: (a) use of interstate wire facilities; (b) misapplication of funds; (c) making false entries in the records of the subject institutions; (d) offering something of value to a bank officer to influence that officer; (e) agreeing to accept something of value by a bank officer for the purpose of being influenced in connection with the banks' business; (f) taking and carrying away bank property with the intent to steal; and, (g) conducting a financial transaction with proceeds of an specified unlawful activity knowing that the transaction was designed to conceal the nature, location, source, ownership, or control of the proceeds.

Twenty-five (25) counts of the indictment charge the defendants in various combination with the substantive charges of bank fraud,

wire fraud, misapplication of bank funds, false entries in bank records, bank bribery, bank larceny, and money laundering.

The final count seeks criminal forfeiture of all property to which the alleged proceeds of the unlawful activity may be traced. And, in the event that the actual property subject to forfeiture cannot be obtained, substitute assets are sought in place or instead of the forfeited property.

**Government Contentions:**

The government contends, as it relates to the conspiracy and bank fraud charges, that the defendants, knowing that Memorial Bank, N.A. and Village Green National Bank were troubled institutions, "put into operation a scheme to artificially enhance the financial positions of Memorial and Village Green for the purpose of preventing or delaying a takeover of the banks by the regulators." The government asserts that this scheme was accomplished by "creating sham transactions involving the 'sales' to be returned clandestinely to the banks as newly injected capital from an independent source." To this end, it argues that "straw buyers" such as Amalgamated Oil and Gas Company ("AOG"), First City Realty Corporation ("FCRC"), and Credit Recovery Corporation ("CRC") were created simply to make specific purchases of charged-off loans, personal property and real property in possession of the banks as a result of prior foreclosures and write-offs, with proceeds derived from the sale of various loan packages to the banks.

As facts supporting its charge of conspiracy and bank fraud, the government points to the fact that: (a) Robert J. Creighton, a contract employee of Memorial and later Oxford, became the president of CRC; (b) Mary Jane Haines, the wife of John Thomas Cloud and a principal of Oxford, was named president of AOG; and, (c) James Harold Carpenter, contract employee of Oxford, served as president of FCRC. The government asserts that by creating these "sham" corporations, the defendants intended to conceal the fact that the sale and purchase transactions were related, thereby denying the Office of the Controller of Currency ("OCC") and the Federal Deposit Insurance

Corporation ("FDIC") the appropriate oversight functions that they usually and customarily exercise.

It is charged by the government that the defendants accomplished the conspiracy and bank fraud by proposing to the directors of the bank, in related transactions, that Oxford would sell to the banks packaged real estate loans at inflated prices and funnel proceeds from the sale of those packages to corporations such as AOG, FCRC, and CRC for the purposes of purchasing selected troubled assets from the banks. The purpose of this procedure, according to the government, was to conceal from the OCC and the FDIC that the transactions were related and that the entities were using the banks' own funds to purchase trouble assets from the banks.

The effectuation of this alleged conspiracy and bank fraud scheme gives rise to the substantive offenses charged in counts three (3) through twenty-six (26) and the forfeiture count is charged in count twenty-seven (27).

**Conspiracy and Bank Fraud Defined:**

■ A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. Title 18 U.S.C. § 371. For a jury to find any defendant guilty of conspiracy, it must be convinced that the government has proved beyond a reasonable doubt that: (a) two or more persons made an agreement to commit the offenses as charged in the indictment; (b) the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and, (c) one of the conspirators, during the existence of the conspiracy, knowingly committed at least one of the overt acts described in the indictment in order to accomplish some object or purpose of the conspiracy. *Id.* at § 371.

The conspiracy as alleged, in the case at bar, asserts a scheme to defraud federally insured financial institutions as provided in Title 18 U.S.C. §§ 1343, 1344, 656, 1005, 215, 2113(b) and 1956(a)(1)(B)(i), by selling packaged notes to the banks and, in turn, through subsidiaries or third parties, purchasing troubled assets from the same banks. At all times during the alleged conspiracy, mid–

1989 to on or about May of 1991, the banks were operating under a "Cease and Desist Order", which order prevented the banks from making any substantial loans. Simultaneously, the banks were under regulatory supervision and were charged with the duty to enhance their capital positions.

**The Defendants' Position:**

The defendants assert that the sale of packaged notes to the banks and the purchase back of troubled assets from the same banks were mutually beneficial. They argue that the "Yield Program"[1] offered to the banks by Oxford permitted the banks to legitimately enhance their capital accounts by acquiring an income stream superior to the ones that could be generated by new loans, while simultaneously disposing of troubled assets. They further argue that the transactions were not "trash for cash schemes," the notes were not sold at inflated prices, the troubled assets purchased from the banks were not worthless, and the transactions were appropriately documented in the records of the banks.

**Discussion:**

***Conspiracy and Bank Fraud:***

■ The bank fraud charge is joined for the purpose of this discussion, with the conspiracy count because the proof required of the government is essentially the same. To prove bank fraud, the government must establish, beyond a reasonable doubt, that the defendants engaged in a scheme to obtain money from the banks under false pretenses, knowing that the false pretenses would both influence the bankers and deceive the regulators. Title 18 U.S.C. § 1344.

■ In order for the government to avoid a Rule 29 motion on the conspiracy count, there must be some evidence on each of the necessary elements sufficient for the Court to determine that a jury could find that the crime of conspiracy occurred, beyond a reasonable doubt. *United States v. Malatesta,*

590 F.2d 1379 (5th Cir.1979). *See also United States v. Salazar,* 958 F.2d 1285 (5th Cir.1992).

■ If the transactions between Oxford and the banks had "economic substance" then several of the offenses that make up the conspiracy and bank fraud charges fail. The government suggests that these transactions were without economic substance because the real estate loan packages were sold to the banks at inflated prices, essentially "cooking" the banks' books. On this point, the Court determines that *United States v. Beuttenmuller,* 29 F.3d 973 (5th Cir.1994), is instructive.

In *Beuttenmuller,* the government charged the defendant, among others, with conspiracy to commit bank fraud and aiding and abetting the making of false entries in credit institution reports. The government argued that the transaction was illegal because it was a "cash for trash" transaction. A "cash for trash" scheme is an illegal scheme where an institution sells real estate owned, ("REO") that has been wholly financed by the institution that owns it, in violation of banking regulations that require at least a 20 percent down-payment. *Id.* at 979. In these type transactions the parties may pretend that the down-payment was made by the purchaser, when in truth it was not.[2]

In the case at bar, the transactions were "value-for-value" transactions. Specifically, the banks were willing purchasers and willing sellers. Oxford was a willing seller and the third-party entities were willing purchasers of the REO. In all instances, the parties received what they had purchased, and there was adequate consideration on both sides of the transactions negating any claim of actual fraud. The fact that the banks purchased the loan packages on a dollar-for-dollar basis is of no moment. This type transaction is nothing more than value-for-value transaction. The fact that Oxford and the banks, as a part of the agreement between the parties,

---

1. The details of the yield program are not important to this discussion. However, the program was designed by Oxford for the purpose of enhancing a capital poor bank's position by selling to the bank high yield loan packages and purchasing troubled assets from the same bank.

2. The government is of the opinion that the Louetta property was not booked correctly in accordance with FASB 66. Yet, they are aware that the bankers relied upon the opinion of Sam Pierce, an outside CPA, in choosing the accrual method of booking.

agreed to spend at least 20 percent of either the gross sale or net profit for the REO, is not illegal. Because the banks needed to increase their capital accounts, it logically follows that they would want to "unload" REO because its presence on the books diminished the banks' capital positions, thereby diminishing funds available for loans. Moreover, the evidence fails to establish that the REO had greater values than the values attributed to them, or that the loan packages had lesser values than the values attributed to them.

The government argues that because Oxford and the third-party entities were related in some respect, the transactions were not properly recorded on the books and records of the banks. Thus, it argues that the conspiracy and bank fraud charges have as their "central core" the concealment of material information from bank examiners and the financial institutions.[3]

This argument too, fails. The argument presupposes that there were recording requirements that were not accomplished. Alternatively, it presupposes that the entries made were false or inaccurately recorded, or that Oxford and the banks' directors and officers had a duty to explain the transactions to OCC and FDIC officials. Neither of these suppositions is founded in the law and neither is it supported by the evidence. On the contrary, the transactions were properly documented and the records were at all times available to the banks' regulators.

The evidence also shows that Robert J. Creighton performed the due diligence on the note packages. He testified that the notes were income producing, had good collateral, and would increase the banks' capital accounts. The evidence shows that the regulators reviewed documents associated with the purchased assets, and passed upon them. Even considering the issue of the credibility of Creighton, it is undisputed that the board of directors of the banks discussed and approved the purchases and sales. For the

regulators to look to the loan committee minutes for evidence of the transactions was not only foolish, it missed the point. Moreover, the fact that the OCC regulators looked at the transaction as though they were loan transactions is not controlling. These transactions were bulk sales transactions, capital acquisitions, made pursuant to Uniform Commercial Code.[4] Therefore, no record should exist in the minutes of the loan committee concerning capital acquisitions.

The government next argues that changes were made in the documents that deceived the banks and the regulators concerning the true nature of the transactions. In this regard, the evidence shows that in several instances changes were made in the "interest due" column. Gumm, the OCC regulator claims that he relied upon this summary in reviewing and commenting on the acceptability of the transactions.

The fact is, these changes dealt with closing the transaction with a current "interest paid" status and never altered the "pay history" of the individual loans. To the extent that these modifications could arguably represent altered documents, the alterations did not result in any false entries being made on the books and records of the banks. As well, the modifications did not constitute bank fraud because the basis for the bargain did not change and there is no evidence that the changes in the "interest paid" summaries were material to the permanent records of the banks. The amount of the loan due, the collateral, and the pay history, did not change. The bank got what it paid for.

■ Also, these transactions did not violate the Tying Act.[5] The Tying Act contemplates a circumstance where a bank official coerces a customer to engage in a unrequested transaction in exchange for the requested transaction. Here, the transactions were arms-length between parties who had negotiated the desired terms.

---

**3.** Government's memorandum of law regarding admission of evidence, filed December 4, 1995.

**4.** See Vernon Tex.Code Ann., Bus. & Comm. §§ 6.101 *et. seq.* and 9.101 *et. seq.* (Vernons 1991).

**5.** See 12 U.S.C. § 1971 *et. seq.* stating, "A bank shall not ... extend credit ... on the condition ... that a customer ... obtain additional credit...."

The government's assertion that the sellers' closing statements were not in the banks is also without legal foundation. The evidence fails to establish that the sellers' closing statements were required documents for the banks, or that the Oxford defendants had a duty to provide or disclose them. *See Lubin v. United States*, 313 F.2d 419, 422 (9th Cir.1963). It is logical that the banks would be in possession of their own closing statements. In fact, Creighton testified that he personally delivered the bank's closing documents to the bank after each closing. This testimony is supported by an FDIC official's testimony identifying the records in the FDIC's files.

The government's suspicions surrounding Oxford's closing statements is nothing more than suspicions. It is not the province of the banks to know what Oxford did with the proceeds that it earned from the sale of the note packages. In fact, how the funds were used was the personal business of Oxford. The banks had no right to know and Oxford had no duty to disclose how it was spending its own money.

The government next argues that had the regulators known that Oxford and the third-party entities were related they would have collapsed the transactions. In other words, had they known that the sale of the loan packages were related or conditioned upon Oxford or a third-party entity purchasing REO, the regulators would have collapsed the transactions. The fact that the regulators *may* have chosen to collapse the transactions is immaterial to a criminal prosecution. The question proper is whether a crime was committed by the bankers, Oxford and the third party entities. The object of the Yield Program was not concealment, on the contrary, it was disclosure.

The issue from the banks' perspective was how may the transactions be documented such that the banks' capital position could be improved. It was the parties' intent to improve the banks' capital accounts. The creation of third-party entities by Oxford was done for the purpose of legitimizing the transactions. Both Oxford and the bankers knew that the regulators would not favor a purchase and sale between the same entities.[6] The evidence fails to establish that the transactions were related in an illegal way, without regard for whether the transactions could or would have been collapsed.[7] The fact is the regulators never collapsed the transactions even though they learned about the relationship between the parties before the banks were declared insolvent. Moreover, the transactions were not fraudulent simply because the regulators were unaware of Oxford or the third party entities. Oxford's profits were Oxford's to do with as it saw fit.

Finally, there is no evidence that any relevant documents were forged, backdated, or destroyed. The government argues that the evidence that documents were removed from the banks, or are otherwise missing, is evidence of "consciousness of guilt." This theory, it argues, finds supports in the case law *citing United States v. Gleason*, 766 F.2d 1239 (8th Cir.1985). However, there is no evidence, and no proffer has been made, showing that any records that were removed from the banks, or that were destroyed, were relevant to the crimes charged. Thus, testimony that records were removed or destroyed is not probative of a consciousness of guilt where relevance is not first established.

The government also charges that something of value was offered to bank officials for the purpose of influencing their decision concerning whether to engage in the transactions. First, the government argues that the banks would not have purchased the loan packages without the reciprocal agreement from Oxford or the third-party entities, that REO or other written-off loans would be purchased. This influencing argument over-

---

6. Such a transaction would not be illegal, however. The effect of the transaction on the books of the banks may have been different where the two transactions are between the same parties.

7. An agency official testified that the booking of the transactions were governed by FASB 2, 5 and 66 and particularly, Opinion 21 paragraph 12.

To the extent that these accounting principles represent the structure for how real estate transactions ought to be recorded, so be it. To vary from these principles is not to commit a crime but, when a crime has been committed, the variance may explain one's intent.

looks the fact that this term was a basis of the bargain. The banks sought to improve their position by purchasing the loan packages and selling charged-off loans. It is apparent that this was nothing more than a negotiated position. It was the bankers who insisted upon this term—and for good cause. They sought to protect the integrity of the transactions and to comply with the regulators' demand that the capital accounts be improved.

Second, the government argues that the Oxford defendants sought to purchase the stock note obligations that supplied part of the original capital for the banks. To discuss with the Oxford defendants the possibility that the Oxford defendants may be interested in purchasing the positions of the directors of the banks, is a violation of § 215, according to the government, particularly, where the banks are being encouraged to purchase more loan packages as a bargaining chip. The evidence does not support this charge.

It was known by the bankers and within the Oxford circle that Oxford was interested in purchasing a bank. However, the purchase was sought only to "shore-up" Oxford's position in the market. Oxford wanted a free hand in the bank's "till" to ensure a steady stream of business. The evidence failed to establish that any banker was offered or received anything of value that influenced this decision. On the contrary, it was the heat from the regulators and the desire to save the banks that "spurred" the bankers into these transactions.

The Court concludes that no rational jury could find, beyond a reasonable doubt, that the defendants engaged in a conspiracy or bank fraud of the sort stated in the indictment. *Salazar*, 958 F.2d 1285. The Court turns next to the evidence as it relates to the remaining substantive counts in the indictment. *United States v. Burns*, 597 F.2d 939 (5th Cir.1979).

8. "Sham" corporation is a misnomer. It is undisputed that the corporations in this case were legally created under the laws of the state of Texas. Whether they functioned in accordance

## FALSE ENTRIES IN THE BOOKS:

■■■ In ten (10) counts the government charges that the defendants engaged in, or aided and abetted engagement in, the misapplication of bank funds and in making false entries in the books and records of the banks. Title 18 U.S.C. §§ 656 and 1005. A violation of § 1005 is usually involved when there is a violation of § 656, because a false entry is often used to cover-up the misapplication. However, a violation of internal operating procedures and failure to disclose conflicts of interest do not, in themselves, constitute federal criminal violations. *United States v. McCright*, 821 F.2d 226 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). Likewise, a bank officer cannot be found guilty of misapplication based solely on a violation of a bank regulation. *United States v. Christo*, 614 F.2d 486 (5th Cir.1980).

■ In order for the government to prevail on a § 1005 charge of false entries, the government must establish the following elements, beyond a reasonable doubt. The government must prove that the defendant was an officer, director or employee of an institution covered by the statute, that the defendant made or aided another in making entries in the books and records of the institution, which the defendant knew to be false, and that the defendant acted with the intent to injure or defraud the institution.

■ In the case at bar, the government asserts that the bankers failed to disclose in the banks' books that funds received by the banks, in the purchase of REO or troubled assets from the third-party entities, were derived from the funds paid to Oxford during the purchase by the banks of loan packages from Oxford. The government refers to the purchase of the troubled assets as "sham" purchases. It refers to the corporations that made the purchases as "sham" corporations.[8] The sole basis in argument for this characterization is the fact that Oxford supplied or loaned the funds to these third-party entities in order that the entities could make the

with the law or were used to defraud are questions of fact requiring proof. The fact that they were single purpose corporations is not dispositive of the issue.

described purchases from the banks. These transactions had nothing to do with the bank's records.

■ The purpose of a bank's records is to insure that regulators or inspectors may see an accurate picture of a bank's condition. *United States v. Baker,* 61 F.3d 317 (5th Cir.1995). It is not the province of the inspector to know the details of every transaction that makes up the picture. To be a false entry, the entry must be an omission of material information that impairs or prevents the function of the government agency. *See Beuttenmuller,* 29 F.3d at 982.

The government argues that the defendants omitted telling the regulators that Oxford and the third-party entities were related entities and that this failing was deliberate, designed to deceive. This argument overlooks the fact that Oxford acted as a broker in these transactions. Oxford found a willing seller and a willing purchaser and kept the two apart in order that it could later act as the seller of the loan packages by conducting a double closing. By handling the transactions in this manner, the right hand did not know what the left hand was doing and Oxford was able to increase the commission that it had been able to earn from a distressed seller. Even if it were argued that Oxford was the seller, it could be so only for a fleeting moment. The most accurate description of Oxford's role, however, is that of a broker.

■ As these facts apply to this case one can readily see that two of the elements of the offense of false entries are not supported by the evidence, beyond a reasonable doubt. First, the entries made on the books of the banks were not false. In fact, the entries were correct. The dispute then moves to how the entries should have been treated on the books from an accounting perspective. The debate was over whether the "legal effect" of the transaction should prevail or not over the "economic substance" of the transaction.[9] Even assuming that the economic substance theory prevails, accounting for the transaction based on the legal effect of the transaction does not make the entries false.

It simply focuses the discussion on the value of the transaction from the seller's and buyer's perspectives. A false entry is not made where the transaction entered actually took place, and are entered exactly as they occurred. *See Coffin v. United States,* 156 U.S. 432, 463, 15 S.Ct. 394, 406, 39 L.Ed. 481 (1895).

Here, the transactions were recorded exactly as they occurred. The fact that regulations or accounting principals would dictate an accounting treatment different than the treatment given, even if the parties intended to defraud the bank, is not a false entry. *United States v. Manderson,* 511 F.2d 179, 181 (5th Cir.1975). The record and the evidence shows, additionally, that the defendants' actions were designed to help, as opposed to injure, the banks. Even if the entries could be labeled as false, and the Court is not concluding that to be the case, the fact that they were properly recorded negates the offense of false entry. *Coffin,* 156 U.S. at 463, 15 S.Ct. at 406.

## MISAPPLICATION OF BANK FUNDS:

■ Likewise, the charges of misapplication must fail. To prove misapplication of funds the government must prove that an officer, director or employee of the bank insured by the FDIC, knowingly and willfully misapplied monies of the bank with intent to injure or defraud the bank. *United States v. Mann,* 517 F.2d 259, 267 (5th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Intent to defraud means to act with intent to cheat or deceive either to cause a financial loss to someone or a financial gain to one's self. *See* United States Fifth Circuit, *Pattern Jury Instructions,* Criminal Cases (1983). A showing that entries were correctly recorded, resulting in funds being disbursed pursuant to an agreement and the transaction, is not a misapplication of funds.

■ The misapplication referred to in the relevant indictment charges that, at the time of the transactions between the banks and Oxford, both sides knew that a portion of the sale proceeds would be returned to the banks in exchange for troubled assets. *See*

9. See footnote number 6, *supra.*

Title 18 U.S.C. § 656. At most, this argument shows a linkage between the two transactions, in which event, the transactions may be collapsed. The fact that the transactions may be collapsed under an "economic substance" theory does not mean that the transactions were irregular and should be reversed. Moreover, it does not make the transaction illegal. Violations of banking regulations as it pertains to how a transaction is booked is no evidence of a crime. *See United States v. Cleary,* 565 F.2d 43, 47 (2nd Cir.1977) *cert. denied,* 435 U.S. 915, 98 S.Ct. 1469, 55 L.Ed.2d 506 (1978). Therefore, the Court must look to determine what evidence exists suggesting that the bankers intended, by their conduct, to injure or defraud the bank. *See United States v. Adamson,* 700 F.2d 953 (5th Cir.), *cert. denied,* 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). On this point, it should be noted that violation of a bank's policies or procedures intended to protect the bank's interest is also relevant to the issue of intent. *United States v. Clark,* 765 F.2d 297, 303 (2nd Cir.1985).

Here, the evidence shows that the banks were under an order to increase their capital accounts. The bankers engaged in the transactions stated in the indictment for the purpose of increasing the capital of the banks, not for the purpose of injuring or defrauding the banks. The effect of a particular conduct can be a crime only when the effect was the bankers' intent. Here, no inferences of a crime can be drawn from the bankers' conduct because their intent is not in dispute. They intended to save the banks.

 Applying the basic principle of *Ejusdem generis,* it is evidence that to constitute misapplication of funds, within the meaning of the statute, the bank officers' conduct must involve some risk of loss to the bank as opposed to a violation of a regulation, bank policy or accounting principle designed to account for assets. *Clark,* 765 F.2d at 303. Moreover, the fact that a bank official makes a transaction that is legal or appropriate with knowledge that the recipient of the sale proceed will turn around and lend part of those proceeds to a third party is not a crime. *Compare United States v. Adamson,* 700 F.2d 953, 956 (5th Cir.1982)

*cert. denied,* 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983).

The Court concludes that no reasonable jury could find the defendants guilty of the offenses of making false entries in the books of the banks and misapplication of bank funds, beyond a reasonable doubt. *Salazar,* 958 F.2d 1285.

The indictment in this case also charges wire fraud, bank bribery, bank larceny, money laundering and forfeiture. These charges are derivative, or related to the crimes of conspiracy to commit bank fraud and bank fraud. Therefore, these substantive charges will be examined to the extent necessary to determine whether the evidence supports a submission to the jury. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**Bribery Charges:**

A person commits bribery when he offers something of value to anyone with the intent to corruptly influence or reward an officer, director, employee, agent or attorney of a federally insured financial institution in connection with a transaction. Title 18 U.S.C. § 215. The indictment charges that Oxford defendants offered to purchase the debts and obligations of various bank officials.

 The evidence shows that the Oxford defendants, at a point in time, determined that they wanted to purchase a bank(s). Contact was made with various directors and/or shareholders regarding their individual interest, if any, in selling the note obligations associated with the purchase of Memorial and Village Green stock. The Oxford defendants apparently thought that a straight purchase would require a different approval process from the OCC, than one where they purchased the note obligations and simply foreclosed on the occasion of any default in payments. It is not disputed that the note obligations were located at banks other than Memorial and Village Green.

Pursuant to the plan to boost the capital accounts of Memorial, Creighton solicited letters of commitment from individuals to the effect that the individuals intended to invest a substantial sum of money in the banks. Letters from individuals such as James Car-

penter were forwarded to Memorial. Creighton testified that Carpenter never intended to purchase the bank's stock but had provided the letter because an Oxford official had requested that he do so. Whether Carpenter intended to make a purchase or not, it is undisputed that others did.

First, the government argues that this conduct, providing a false statement of intent, is relevant to show the Oxford defendants' predisposition to take control of the banks without revealing in advance to the OCC who the real purchasers would be. This conduct does not constitute bribery and it does not amount to bank fraud or conspiracy, as contemplated and charged by the indictment. Of equal significance, is the fact that this conduct did not affect any entries in the books and records of the bank, such that the soundness of the bank was implicated.

Secondly, no crime is committed by the bank officials or Oxford officials in their effort to stall a take-over of the institution by the FDIC. It was the bank officials' fiduciary duty to the stockholders and depositors to do every legal act to turn the banks around. If turning them around meant delaying the regulators in their efforts, so be it, so long as no crime was intended. It is clear that the officials on both sides of the transactions were keenly interested, if only for selfish reasons, to "fix" the capital account problems at the banks.

Finally, it is of no moment that the Oxford officials attempted to take-over the banks through note purchases. The obvious is that several, if not all, of the stockholders wanted out because to get out would limit their financial exposure. Specifically, if the FDIC stepped in and closed the institution, the stockholders would lose twice, if not three times. First, they would lose their investment in the banks. Second, they would remain obligated to pay-off the underlying stock notes that had been used to purchase the banks. And third, there is the potential for civil and criminal exposure concerning the decisions that were made during their terms as stockholders and directors, and potentially beyond.

The government's allegation that the stock purchase offers were made simply to encourage the banks to engage in additional transactions with Oxford, is not well founded. There was more to this engagement than first meets the eye. No change of control of the banks ever occurred and there is no evidence that the plan to purchase the notes underlying the bank stock was ever consummated. In fact, the evidentiary cupboard is bare of any benefit to the banks or the banks' official from Oxford that was not a part of the transaction agreements made the basis of this indictment.

No jury could find, beyond a reasonable doubt, that the acts described herein constituted a bribe of bank officials because no request was made of a bank official that was in violation of the officials' duty. *Malatesta*, 590 F.2d 1379.

And, because no bribe was offered, no bribe could be received. This count of the indictment fails as you consider the reasoning heretofore stated. As well, there is no evidence that any bank official did any act or failed to do any act in violation of his official duty. Therefore, no jury could find, beyond a reasonable doubt, from the acts described in the indictment as they relate to the evidence, that a crime was committed. *Id.*

**Bank Larceny:**

In a single count, the government charges that the defendants committed the offense of bank larceny in violation of Title 18 U.S.C. § 2113(b). Bank larceny occurs when a person deprives the bank of its property under false pretenses—to take without adequate consideration. *Id.*

 The essential elements of this offense requires the government to prove, beyond a reasonable doubt, that an individual, with intent to steal money or property belonging to a federal bank, willfully or intentionally removed such property from the care, custody, control, management or possession of the bank. *Ibid.*

In the case at bar, the government alleges that the defendants caused diamonds, representing part of the collateral for a loan, and acquired by the bank through a foreclosure, to be taken from the bank under false pretenses in connection with a scheme to de-

fraud the bank. The basis of this charge is "rooted" in the government's charge of bank fraud and conspiracy.

It is the Court's view, and the evidence supports the conclusion, that each of the transactions were "value-for-value" transactions, that the diamonds in question left the bank only after adequate consideration was paid, and that the consideration paid was agreed to by the bank officials. While the government argues that the effect of the transaction placed the diamonds in the hands of Oxford officials and that the funds used were bank funds, these arguments are not supported by the evidence and are based on a preference of economic substance over legal structure. While a federal agency may ignore legal structure in determining how it will "book" a transaction in the records of a bank, it may not ignore the legal effect of legal structures that are designed by the state legislatures and Congress, the law makers.

In summary, the bookkeeping treatment dictated by general accounting principles or by regulators cannot "trump" state and federal law that dictate the structure of business transactions. As matter of law, this count fails.

**Wire Fraud Charges:**

In three (3) counts, the government charges that the defendants committed wire fraud. It is alleged that on two occasions in December 1989, and one occasion in March 1990, that the defendants caused the transmittal of certain writings, *etc.*, between the states of Texas and Oklahoma and Texas and Chicago. The allegations are that money was wired and documents were transmitted by facsimile to these locations with the intent to defraud the OCC, the FDIC, as well as the banks. The ultimate purpose being to obtain money and property by means of false pretenses.

██ In order to establish these counts the government must prove, beyond a reasonable doubt, that the defendants devised a scheme to deprive the banks of the benefit of it's bargain or the depositors' money, and acted with intent to do so utilizing the wire

service to carry out the scheme. Title 18 U.S.C. § 1343.

██ In the ordinary or usual case of wire fraud, the government must establish that the use of the wire service was an *important* part of the scheme. *See Criminal Jury Instructions,* Fifth Circuit, *comment following instruction* (1983). Therefore, it is not wire fraud if the use was only incidental to a crime. In other words, if the object of the crime cannot be committed except through the use of the wire service, then the additional crime of wire fraud is chargeable and provable. As well, if the wire service is used to effect or further a crime that has been committed, then the crime of wire fraud is implicated. *Id.*

██ Assuming that no crime was committed arising out of the transactions made the basis of this indictment, and the Court has found that no conspiracy, bank fraud, misapplication of bank funds, false entries in bank records, bank bribery or bank larceny has been proved, the fact that the wire service was used on December 7 and 9, 1989, and March 8, 1990, is of no moment. It, therefore, is not an important part of a scheme to defraud the banks.

The Court holds that, because there was adequate value on both sides of the transactions at issue, no fraud occurred. Incorporating the Court's previous reasoning here as well, it is the Court's opinion that the use of the wire service was not an *important* part of the alleged conspiracy, bank fraud, misapplication of funds, false entries, bank bribery or bank larceny. Under these facts and in this circumstance, no jury could find, beyond a reasonable doubt, that the crime of wire fraud was committed. *Malatesta,* 590 F.2d 1379.

**Money Laundering Counts:**

██ In eight (8) counts, the government charges that the defendants engaged in money laundering in violation of Title 18 U.S.C. § 1956(a)(1)(B)(i). The government asserts that the defendants conducted financial transactions with proceeds that they knew were derived from unlawful activities, *i.e.,* misapplication of bank funds and bank fraud, with knowledge that the purpose of the

transactions was, in part, to conceal the ownership of the proceeds.

In order to prevail on these counts, the government must prove, beyond a reasonable doubt, that the relevant defendant knowingly received proceeds that resulted from bank fraud or misapplication of bank funds with the intent to conceal the source or true ownership to avoid or prevent the regulators from knowing that the transactional proceeds were used to either purchase charged-off loans from the banks or to invest in other ventures. *Id.*

The operative determination in this analysis, is whether a crime was committed from which it could be said that proceeds were laundered. The eight counts deal with the handling of the proceeds derived from Memorial and Village Green banks as a result of the sale of loan packages to them. Therefore, if no crime of bank fraud or misapplication has been proved, it follows that money laundering cannot be proved, as a matter of law. It would be simple to say, that because the Court has found that the stated underlying crimes were not committed, these charges also fail. However, there is more to be said here.

■ There is no statutory requirement that the Oxford defendants reveal to the bankers or the regulators the source of their funds. The theory behind the Money Laundering Act is that the disbursement of any specified unlawful proceeds impedes the government's efforts to accumulate information germane to the underlying crime. The Act seeks to punish obstruction of justice; the hiding of the evidence of the crime.

Here, the defendants left a clean paper trail so well defined that the regulators could follow it. No unusual transactions occurred and no obfuscation of the funds can be proved. In short, there was no concealment revealed that is not protected by the Fourth and Fifth Amendments to the federal Constitution. These counts in the indictment are without foundation and shall be dismissed.

**Criminal Forfeiture:**

■ Finally, the indictment seeks criminal forfeiture of the proceeds derived from the asserted unlawful transactions pursuant to Title 18 U.S.C. § 982. This statute permits criminal forfeiture of property that is derived from proceed traceable to a violation of banking statutes. Because no crime has been proved in the 26 count indictment, count twenty-seven the forfeiture count, fails for lack of substance. The Court turns next to the defendants' motion to suppress.

**II.**

■ Previously, the Court denied the defendants' motion to suppress because the Court determined that, even if the affiant, FBI Agent Tom Conlon, included false statements in his affidavit for search warrant, there was sufficient other evidence to support probable cause for its issuance. The affiant, through mischief or a lack of knowledge, was mistaken on the law. That mistake did not negate the possibility that evidence existed establishing that the defendants intended to commit the crimes that were ultimately charged. Therefore, the Court denies the motion to suppress.

**III.**

■ Next, the Court turns to the defendants' third motion to dismiss based on prosecutorial misconduct. In two previous hearings, the first and second motion to dismiss, the Court found that:

a) the Court ordered the delivery of *Brady* material far in advance of trial (see document numbers 131, 187, 200 and 343);

b) the *Brady* materials in question are constituted of FBI 302 reports and Grand Jury testimony of *witnesses* whose testimony or statements support the defendants' theory of the case and refutes that of the government;

c) the government failed in its duty to be forthright in the disclosure of *Brady* materials;

d) the government failed to produce, within a reasonable time, what it considered questionable materials so that the case could be appropriately administered and the rights of the defendants could be protected;

e) the government intentionally failed or refused to comply with the law, by asserting, disingenuously, that impeachment materials do not constitute *Brady,* but instead *Giglio* and, therefore, denied any obligation to tender the documents in accordance with *Brady; See Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963); *see also, Williams v. Dutton,* 400 F.2d 797 (5th Cir.1968) *cert. denied,* 393 U.S. 1005 [1105, 89 S.Ct. 908, 21 L.Ed.2d 799] (1969).

f) the failing of the government, in its duty under the federal Constitution to not violate the Sixth Amendment rights of the defendants to a fair and open trial, prevented the defendants from making an appropriate opening statement rebutting the government's theories of prosecution;

g) the government made misrepresentations of facts to the Court that Robert Creighton was not "taking any drugs" in response to charges by the defendants that Creighton was possibly on psychotic drugs. The facts show that not only had Creighton been hospitalized for a psychotic episode but was currently taking a psychotic drug. At the very least, this conduct was reckless. At most, it was intended as a fraud on the Court. (See trial transcript).

h) the government made misrepresentations of facts, or at least gave misleading facts, to the Court regarding instructions given to a witness, Keith Franze. In this regard, the government stated that no one ever "instructed him [Franze] not to talk to [anyone]." Franze testified that "they suggested that I not [talk] with the defendants in the case." "[I]t would be best if I [Franze] avoid them." (See trial transcript)

The Court has since determined that:

a) a comparison of the 302 statements of witnesses to the same witnesses' Grand Jury testimony is revealing. The FBI agent took extensive liberties, choosing conclusionary words that caused the statements to fit within the government's theory of the case. Assuming that this conduct was merely overzealousness, the error was exposed during the Grand Jury testimony of the same witnesses. Without doubt, this disparity came to the United States Attorney's attention because, the tone and tenor of the questioning of the witnesses before the Grand Jury is also revealing, to say the least.

b) the Court was required to review at least eight (8) transcripts of the Grand Jury testimony, determining in each of the eight, that the testimony was wrought with statements that both, supported the defendants' theory of the case and foiled that of the government, with few exceptions.

c) the testimony of Jim Carpenter, Carmen Cooper, Robert Creighton, Walter Fagan, Anthony Gullo, Fred Haas, Leland Jones, Mary Ellen Kallmeyer, David Gumm and several others, called or not by the government, supports the defendants' claim of innocence. (See 3rd motion to dismiss in response to *Brady* violations).

d) the government's contentions of equal access, neutral evidence, that the defendants were aware of the information possessed by the Grand Jury, that the testimony was merely impeachment, and that they acted in good faith, is incredible. Only a person blinded by ambition or ignorance of the law and ethics would have proceeded down this dangerous path.

Here, it appears that the duty and obligation of the government to not prosecute where the evidence at best is disputed, leaves the defendants' Sixth Amendment right to a fair trial snared on the branches of strange and subverted truth. *See Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). A fundamental principle of reciprocity dictates that there can be no liberty or justice for any one of us except, that there is liberty and justice for all. Each of us has a separate and distinct duty to guard these fundamental principles.

It is ORDERED that the monetary sanctions entered earlier in this case are Withdrawn for all times, and the defendants' Third Motion to Dismiss, because of prosecutorial misconduct, and Motion to Dismiss pursuant to FRCP 29 are GRANTED.